**PALO ALTO TENANTS UNION, an unincorporated association, et al.,**

v.

**George MORGAN, Palo Alto City Manager, William Hydie, Palo Alto Police Chief and J. Stewart Bottema, Palo Alto Chief Building Officer, individually and in their official capacities.**

**No. C–70 2068.**

United States District Court,
N. D. California.

Dec. 18, 1970.

Charles Constantinides, of Henner, Wolpman, Constantinides & Cohen, Palo Alto, Cal., and Sheldon Otis, Legal Aid Society of San Mateo County, Redwood City, Cal., for plaintiff.

Peter G. Stone, City Atty., Robert K. Booth, Jr., Sr. Asst. City Atty., Marilyn D. Norek, Asst. City Atty., by Robert K. Booth, Jr., Palo Alto, Cal., for defendants.

### MEMORANDUM OPINION AND ORDER DENYING INJUNCTIVE RELIEF.

WOLLENBERG, District Judge.

This action, filed on September 25, 1970, is brought under the federal civil rights and declaratory judgment statutes. 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202. It asks that the Court permanently enjoin defendants from "harassing" plaintiffs "under the guise of enforcement or authority" of Palo Alto, California, Municipal Code sections 18.-04.210 and 18.88.050. The Court is further asked to declare the cited ordinances unconstitutional.

These are zoning laws. Like most cities, Palo Alto has zoned certain of its neighborhoods "R–1" or "single family residential". § 18.04.210 defines "family" to mean "one person living alone, or two or more persons related by blood, marriage, or legal adoption, or a group not exceeding four persons living as a single housekeeping unit". Plaintiffs sue on behalf of themselves and all others who constitute groups of persons, unrelated within the meaning of § 18.04.-210, who inhabit dwellings in "R–1" neighborhoods, though the number of persons in each group exceeds four. Plaintiffs claim that these groups "live together as famil[ies], treating themselves and treated by others as family unit[s]". Plaintiffs allege that defendants threaten to enforce the terms of § 18.04.210 [1] so as to make it impossible for these groups to continue, at least in

---

1. § 18.88.050 is similar to § 18.04.210, and deals with situations where persons falling under the definition of "family" provide room and board for other, unrelated individuals. The net effect of § 18.88.050 is to limit the number of unrelated individuals living together in R–1 dwellings.

R–1 neighborhoods, what they contend is a constitutionally protected life-style.

The Court denied plaintiffs' motion for a temporary restraining order, but issued an Order to Show Cause. In response to that Order, the parties submitted extensive briefs and exhibits thereto. Oral argument was had, and it was stipulated that the hearing on plaintiffs' motion for a preliminary injunction would constitute the final hearing on the merits of all claims raised herein. On October 30, the matter was taken under submission, though each party submitted supplementary memoranda, which the Court allowed to be filed on November 12 and 25, 1970.

█ The State has argued for abstention by this Court, but such a course of action has been traditionally justified only where there has been ambiguity in the interpretation to be given a State or local law. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The Palo Alto ordinances herein questioned are clearly applicable to plaintiffs, and nothing would be served by waiting for the State courts to reiterate the obvious.[2]

█ The State also cites 28 U.S.C. § 2283, i. e. the general bar to federal court injunctions of state criminal prosecutions already instituted. The argument seems inappropriate here: at the time of the complaint herein, no criminal proceeding had been instituted against the named plaintiffs. There is also some question as to whether the civil rights statutes do not provide an exception to the operation of § 2283. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (note 2).

The Court thus reaches the merits. Plaintiffs' argument is that the right of unrelated persons to live together "as a family" in a single dwelling place is an "emanation" of the freedom of association specifically guaranteed by the Bill of Rights. Also invoked is the right to family privacy given such importance by the line of cases beginning with Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Since the rights to privacy and free association have been found "pre-eminent" and "fundamental" to our constitutional scheme, plaintiffs maintain that they cannot be infringed by any statute or ordinance absent a showing by the legislating authority of a "compelling state interest". Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). It is argued that Palo Alto can show no compelling need to limit to four the number of unrelated individuals in an R–1 dwelling, and that this is particularly indicated by the fact that "related" families often consist of more than four persons. This distinction between "related" and "unrelated" family groups is said to violate not only the specific Bill of Rights guarantees mentioned above, but also plaintiffs' more general rights to equal protection and due process of the law.

█ The Court must preliminarily consider the applicability of Shapiro v. Thompson, *cit. supra.* Traditionally, zoning classifications have received the same deference from the courts as classifications devised to regulate the economy, protect the public health, or effect the collection and disbursement of tax moneys. Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct.

---

2. An entirely different situation would be presented if plaintiffs' constitutional arguments were bound up with questions of statutory interpretation. Not every municipal definition of "family" is as precise as Palo Alto's, and California courts have been receptive to arguments, based on statutory construction, which have been brought by unrelated persons seeking to live in a single family residence. Brady v. Superior Court, 200 Cal. App.2d 69, 19 Cal.Rptr. 242 (1962). But plaintiffs here ground themselves in the Constitution; if they have no right under the federal Constitution to live together where they will, then they have no argument left to them—at least in Palo Alto.

868, 81 L.Ed. 1245 (1937); see generally Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341 (1949). These classifications have generally been upheld if any state of facts can be conceived which would render the legislative decision reasonable. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

But some classifications, including those promulgated in zoning ordinances, statutes, or referenda, have been deemed "suspect". When a classification discriminates against a racial or religious group, or if it impinges on certain "fundamental interests", it is upheld only if the State demonstrates an overwhelming interest that can be served by no alternative means. Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); Torao Takahashi v. Fish and Game Comm., 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); Shapiro v. Thompson, *cit. supra.*

Dandridge v. Williams, *cit. supra*, reinforces this dichotomy between those classifications which enjoy every presumption of validity and those which may be said to be unlawful *per se*, unless the State carries an almost insupportable burden of proof. See Romero v. Hodgson, D.C., 319 F.Supp. 1201 (1970). Hence, plaintiffs' argument that theirs is a "fundamental interest" is one the disposition of which is crucial to the instant case.

■ The Court is not convinced that plaintiffs have demonstrated infringement of their constitutional right to freedom of association. Plaintiffs have correctly cited the bounds of that right as set forth in past cases: i. e., it includes the right to marry and raise children; to worship God—or not to worship Him—in or out of religious congregation; and to engage in concerted action to achieve political or social goals. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); N. A. A. C. P. v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958). Pierce v. Soc'y of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

Plaintiffs are also correct in observing that a law which barred traditional families from R–1 neighborhoods might well be deemed highly suspect. But there is a long recognized value in the traditional family relationship which does not attach to the "voluntary family". The traditional family is an institution reinforced by biological and legal ties which are difficult, or impossible, to sunder. It plays a role in educating and nourishing the young which, far from being "voluntary", is often compulsory. Finally, it has been a means, for uncounted millenia, of satisfying the deepest emotional and physical needs of human beings.[3] A zoning law which divided or totally excluded traditional families would indeed be "suspect".

The communal living groups represented by plaintiffs share few of the above characteristics. They are voluntary, with fluctuating memberships who have no legal obligations of support or cohabitation. They are in no way subject to the State's vast body of domestic relations law. They do not have the biological links which characterize most families. Emotional ties between commune members may exist, but this is true of members of many groups. Plaintiffs are unquestionably sincere in seeking to devise and test new life-styles, but the communes they have formed are legally indistinguishable from such traditional living groups as religious communities and residence clubs. The right to form such groups may be constitutionally protected, but the right to insist

3. "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." Griswold v. Connecticut, *cit. supra*, 381 U.S. at page 486, 85 S.Ct. at page 1682, 14 L.Ed.2d 510 (*per* Douglas, J.).

that these groups live under the same roof, in any part of the city they choose, is not. To define "association" so broadly, and to apply *Shapiro* so widely, would be to dilute the effectiveness of that special branch of jurisprudence which our tradition has developed to protect the truly vital interests of the citizenry.

The Court must stress what this case is *not*: there is no offer of proof that the ordinances here were devised, or are enforced, so as to discriminate against any group because of its racial, religious or political characteristics. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Nor is there a showing that the ordinances challenged operate to totally exclude the indigent or the politically voiceless from the City of Palo Alto. See generally Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent, 21 Stan.L.Rev. 767 (1969); see also Southern Alameda Spanish Speaking Organization v. Union City, 9 Cir., 424 F.2d 291 (1970). The ordinances here challenged affect only two of the many zones into which the City has been divided. Unrelated groups of more than four persons may live together in other zones, including those designated for lodging houses, hotels, apartment houses, boarding houses, duplexes, triplexes, and so on. Affidavit of Louis J. Fourcroy, Director of Planning and Community Development, Palo Alto, California.

Finally, there is no showing of warrantless searches, unreasonable prying, or of any inevitability of the "repulsive" investigative tactics which the Supreme Court in *Griswold* found antithetical to the constitutional ideal of individual and marital privacy.

The classfication here challenged does not, therefore, impinge upon a "fundamental interest" in such a way as to warrant application of the *Shapiro* standard of substantive due process. It only remains for the Court to judge the due process rationality of these enactments by examining the degree to which they promote the aesthetic, economic, and other legitimate goals of zoning. And hav-ing done so, the Court finds the ordinances rational within the meaning of the equal protection and due process clauses of the 14th Amendment.

■ Zoning laws may properly control population density within given neighborhoods, and this consideration alone might justify an ordinance limiting the number of unrelated persons living in R–1 structures, Calif.Gov't Code, § 65850; Brady v. Sup. Ct., *cit. supra* note 1. It is argued that some traditional families have more than four members, and that "equality" would demand a prohibition of their living together in a single R–1 residence. But given the State's clear interest in preserving the integrity of the biological and/or legal family, and given the fact that the average size of even the traditional family is *less* than four members, the Court sees no arbitrariness in limiting the number of unrelated persons living in an R–1 dwelling, while not so limiting the size of the traditional family in such dwellings. From the standpoint of population density, the ordinances distinguishing between traditional families and groups of unrelated persons do not discriminate between them, save insofar as is necessary to promote clear, and overriding, State interests.

The City has also alleged that large groups of unrelated persons living together in an R–1 dwelling tend to have a greater impact on the neighborhood than do traditional families. Noise, traffic problems, and overloaded parking facilities may tend to result when one-family homes become communal dwellings. This justification for the ordinances cannot be said to be irrational.

Finally, the Court notes the economic rationale offered by the City Attorney in oral argument. Many older neighborhoods have large, once-distinguished town houses which are not owner occupied. Often owners find it more profitable to rent these dwellings, not to single families, but to large groups of unrelated persons with independent sources of income. Such groups are able to pay, collectively, far more in rent than can tra-

ditional families with one, or at best two, wage earners. Thus the rent structure of a whole neighborhood may be affected by opening R–1 zones to large, unrelated living groups. As the rent and property value structure of the neighborhood is changed, single families move out, and the character of the area is altered. Zoning laws, within limits not relevant here, can take account of these economic factors, and this too might provide a rational basis for the classification herein questioned.

The Court finds the ordinances here challenged constitutional. Plaintiffs' motion for preliminary and final injunctive relief is hereby ordered denied. The Clerk of the Court is directed to enter judgment for defendants.