**Bruce BORAAS et al., Plaintiffs,**

v.

**VILLAGE OF BELLE TERRE et al., Defendants.**

**No. 72 C 1030.**

United States District Court, E. D. New York.

Sept. 21, 1972.

Lawrence G. Sager, and Arthur N. Eisenberg, New York City (Bruce J. En-

---

nis, New York City, and Susan N. Herman [student assistant] of counsel), for plaintiffs.

Bernard E. Gegan, Port Jefferson, N. Y. (James J. von Oiste, Village Atty., Port Jefferson, N. Y., of counsel), for defendants.

## MEMORANDUM · INCORPORATING FINDINGS OF FACT AND ORDER

DOOLING, District Judge.

The present action was instituted by Edwin and Judith Dickman, husband and wife, as owners and lessors of a six bedroom one family dwelling located at the intersection of Harbor View Road and Cliff Road in the Village of Belle Terre, and three tenants or occupants of the dwelling. Plaintiff Michael Truman is a twenty-five year old graduate student and teaching assistant at the State University of New York at Stony Brook, who is now in his fourth year of graduate study leading to a doctorate in sociology. He leased the Dickman house from the owners on or about December 1, 1971, for a term ending May 31, 1973 at the rent of $500 a month. Plaintiff Bruce Boraas is twenty-four years old, in his third year of graduate study at the State University at Stony Brook, and is working toward a doctorate in sociology and holds a research assistantship. Plaintiff Anne Parish is twenty-three years old and is a third year undergraduate student at the State University at Stony Brook for the academic year which commences at September of 1972. The defendants are the Village of Belle Terre, an incorporated village, and a municipality under the laws of New York, in Suffolk County, and the Deputy Mayor and the Trustees of the village. The natural person defendants are sued in their official capacities only.

For purposes of the present motion there has not been any direct denial of the principal factual allegations of the complaint, and in general they, with the affidavits submitted on both sides, must be taken at this stage as substantially setting forth the conditions with respect to occupancy of the Dickman house. Plaintiff Boraas has been a resident in the house since about June 1, 1972, and has become a co-signer of an apparently new lease on the same lease terms as that originally signed by plaintiff Truman. He expects to continue as a tenant until May 1973. Plaintiff Parish has not signed a lease, but a check of hers was tendered and accepted in payment of the rent for July 1972. She has been in occupancy since about June 1, 1972, and expects to continue in the house until the end of the term. Three additional students at Stony Brook are now, or have been until very recently, occupants but not lessees of the house: Franklin Beckman, a graduate student in the fifth year of a sociology doctorate program, who was also a teaching assistant; Michael Miranda who is a graduate student in sociology at Stony Brook but who may not continue in the house; and Leonard Cassara an undergraduate student at Stony Brook who planned to leave the house on or before September 1, 1972.

Each of the students occupies a separate bedroom in the house. The rent is apportioned among them, dinner is a common meal, household and yard-keeping chores are distributed among the occupants, and expenses for groceries, newspapers, telephone, utilities, fuel oil and milk are paid from a common treasury to which all contribute. For present purposes, it is not denied that the plaintiff students are living and cooking together as a single housekeeping unit. They are not related to one another by blood, adoption or marriage. What they have in common is that all are students at the State University at Stony Brook, and, in the case of four of the occupants, they have a common interest in prosecuting studies in sociology as graduate students.

The zoning ordinance of Belle Terre establishes a single district, the "A" Residence District, the boundary of which is identical with the village boundaries. The ordinance provides that no building or premise shall be used

and no building in future erected or altered in the village except for use as a one-family dwelling, for a public purpose area owned and operated by Belle Terre, or for accessory buildings (such as a private garage) used incidentally to a dwelling. The ordinance also provides that the lot area of each one-family dwelling shall be at least one acre with a frontage of 200 feet at the building line, residence buildings to be 60 feet back from the street, side yards to be not less than 35 feet on each side, the rear yards to be 90 feet deep.

The critically important part of the ordinance for present purposes is that part which defines "One Family Dwelling" and "Family." Section D–1.34a defines a one-family dwelling as a detached house consisting of or intended to be used as a residence by one family only as a family is defined in the ordinance, and the Section provides that in no case is a "lodging house, boarding house, fraternity house, sorority house or multiple dwelling" to be classified or construed as a "one-family" building. Section D–1.35a defines "Family" as "one or more persons related by blood, adoption or marriage, living and cooking together as a single housekeeping unit, exclusive of household servants." The Section provides further that a number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption or marriage shall be deemed to constitute a family.

In early June 1972, the plaintiffs applied for beach privileges and were denied them on the ground that their residence in the village was illegal and that papers were being prepared against them and their landlord. In mid-July a summons to appear before the Village Justice at the Community Center in Belle Terre was issued on a complaint that the plaintiffs Dickman were leasing, renting or otherwise permitting their premises to be used other than as a one-family dwelling. Later that summons was withdrawn when it was realized that no order to remedy the alleged violation had been issued, served and disobeyed. Under date of July 28th an order to remedy violation was issued to the plaintiffs Dickman, advising them that there existed a violation of Article 3 of the Village Code in that premises were used other than as a one-family dwelling, and the plaintiffs Dickman were directed and ordered to comply with the law and remedy the conditions above mentioned on or before August 3, 1972. The order concluded that failure to remedy the conditions and to comply with the law might constitute an offense punishable by fine, imprisonment or both.

Article 4 Section B–1.12a of the Village Ordinance provides that whenever a building inspector finds a condition in violation of the ordinance he is empowered and authorized and duty-bound to order in writing the remedying of such condition in such manner and within such time as he may specify, and the order must then be served upon the owner, occupant or authorized agent by mail. Under Section B–1.13a failure to correct a condition within 48 hours after receiving the order to do so is deemed a violation of the ordinance, each day constituting a distinct violation. In addition, "any appropriate action or proceeding may be instituted . . . to restrain, correct or abate any violation, or to prevent the occupancy of any such building . . . or to prevent any illegal act . . . or use in or about such building . . .". Article 8 of the zoning ordinance, in Section N–1.4a, provides that in cases where premises are used in violation of the ordinance any appropriate action or proceeding by legal process or otherwise may be instituted or taken to prevent an unlawful use and to restrain, correct or abate any violative use. The Section also provides that each violation of the zoning ordinance constitutes disorderly conduct, and that those responsible for or implicated in a violation of the zoning ordinance shall be disorderly persons and shall be liable for and pay a penalty not exceeding a hundred dollars or be imprisoned for a period not exceeding 60

days, or both. A separate and distinct offense is deemed committed on each day during or on which a violation occurs or continues.

Plaintiffs seek a preliminary and permanent injunction against the institution of criminal or civil proceedings against them to enforce the ordinance in so far as it prohibits residential occupancy by more than two persons not related by blood, adoption or marriage, and against the taking of any other steps intended to or having the effect of enforcing the zoning ordinance, including withholding normal residential privileges, such as beach privileges. The action also seeks a declaration that the building zone ordinance is unconstitutional.

Plaintiffs charge that enforcement of the ordinance against them denies them equal protection of the law, denies them the right of association secured to them by the First and Fourteenth Amendments, intrudes upon the sphere of privacy secured to plaintiffs by the constitution and contravenes their right to travel.

The Dickman house is about seven or eight miles from the State University at Stony Brook. Each of the plaintiffs asserts that he or she looked for rental opportunities in the vicinity of Stony Brook and found that "except for University dormitory accommodations, the only rental situations which I could afford were shared residences like the Dickman house. Apartment rentals, when available, were too expensive."

It appears without contradiction that there are at the State University at Stony Brook twenty-seven dormitory buildings located on campus which can accommodate approximately 6,200 students. The accommodations range from single and double rooms to suites which accommodate four to six students in each suite. The supply of on-campus housing facilities so far exceeds the demand that it has been reported that two of the dormitory buildings will not be open for the academic year 1972–1973.

The cost of on-campus housing appears to be around $650 a year for each student, which would appear to be less than the amount apportionable to each student in the Dickman house.

Belle Terre has a population of about 700 persons and there are 220 homes in the village, all of which are one-family dwellings. There are two houses directly opposite the Dickman house, both of which have previously been rented, one house a four-bedroom house is reported to rent for $350 a month furnished, and the other a six-bedroom house is likewise reported to rent at $350 a month.

Belle Terre is located wholly within the town of Brookhaven which has a population approximating 250,000. Brookhaven's zoning ordinance in Article 1, Section 85–1 defines a one-family dwelling as a detached building designed for or occupied exclusively by one family doing its own cooking. Family in turn is defined as a single individual doing his own cooking and living upon the premises as a separate housekeeping unit or a collective body of persons doing their own cooking and living together upon the premises as a separate housekeeping unit in a domestic relationship based upon birth, marriage or other domestic bond as distinguished from a group occupying a boarding house, lodging house, club, fraternity or hotel.

It will be seen thus that the plaintiffs do not contend that there are not similar dwelling houses which are available to them nor do they deny that there are apartment houses that they could occupy, or dormitory space. The definition of family used in the Brookhaven ordinance would seem to make one-family houses governed by that ordinance available for occupancy by such groups as plaintiffs' group, and their affidavits do not say, and are plainly not intended to say, that the plaintiff students have been unable to find dwelling houses similar to the Dickman house in communities other than Belle Terre which would be equally or more suitable.

The question then is whether the Belle Terre ordinance is valid insofar as it prohibits plaintiffs' occupancy even though the plaintiff students can locate exactly the type of occupancy which they seek in other communities. That in turn raises the question whether the Belle Terre ordinance must be examined on the assumption, for purposes of testing its validity, that the one-family dwelling ordinances of all other communities are identical with Belle Terre's so that, if the Belle Terre ordinance is valid, the plaintiff students would be restricted to those areas in which communal types of occupancy are permitted, that is, where fraternity houses, club houses and boarding houses are authorized dwellings.

■■ 1. Defendants first raise the question of whether the present action can lie at all, and lie in the Federal Court. It is argued that the case is essentially one to enjoin the enforcement of a criminal statute, and that, in any event, the Court should abstain from interpreting the present ordinance until it has been interpreted by the State Courts. Neither contention appears to be sound. The case is not essentially one to enjoin the enforcement of a criminal statute. The action is one to declare a zoning law invalid and to prevent its enforcement. The case is civil in all of its material dimensions. The criminal sanction for enforcement of the ordinance comes to the rearward, far from the real site of the present action. The criminal sanction resembles the contempt order which can follow from the disobedience of a civil injunction. The occupancy itself herein is not criminal under the ordinance but forbidden; when an order to conform the occupancy to law is issued, it is disobedience of that order which is punishable, not the occupancy as such.

What is here involved is the validity of the order based on the ordinance to bring an end to the alleged violation of the ordinance. If the ordinance were on its face and concededly valid immediate obedience could be expected and the criminal sanction might well be invoked because of an unwarranted and contumelious failure to obey a manifestly correct order. That is not the present case. Here, a constitutional challenge of substance is opposed to the order to terminate the alleged violation. There is here no contumacious disobedience of a plainly proper order to terminate a violation of a plainly valid ordinance.

■ No question arises under 28 U. S.C. § 2283 for no case is pending in the State Courts to which the present suit is or could properly be addressed. Rather there is here a direct invocation of the Federal Courts' jurisdiction over cases arising under the constitution and laws of the United States, including the Civil Rights Law, the latter of which obviates the necessity for satisfying the jurisdictional amount requirement. 28 U.S.C. §§ 1331, 1343(3); Younger v. Harris, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 does not reach the present case. The court there had before it the California Criminal Syndicalism Act which punished as crimes certain advocacies of sabotage, violence and terrorism as a means of accomplishing a change in industrial ownership or control or effecting political change. The plaintiffs in the Federal Court action feared prosecution for conduct which if proved would of itself have transgressed the letter of the criminal law. They sought to reach at once and in the Federal Court the issue of whether or not the statute could still be considered constitutional in the light of all that had occurred since the Supreme Court had considered the statute in Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L. Ed. 1095. It is not necessary to consider how far Younger v. Harris has changed the law as it may have stood immediately before the decision was rendered; it is not in the area with which the present case is concerned. Mitchum v. Foster, 1972, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed. 705, marks the difference. There the application of the State was to close down a book store as a pub-

lic nuisance; a preliminary order prohibiting continued operation had been issued. The owner of the book store asked a three-judge Federal Court to enjoin further enforcement of the law. Whatever the precise extent of Mitchum v. Foster, it establishes the jurisdiction of the Federal Courts to entertain such cases under 42 U.S.C. § 1983 as the present one.

The present proceeding is exactly parallel to an Article 78 proceeding (New York Civil Practice Law and Rules, McKinney's Consol.Laws, c. 308, §§ 7801 et seq.) in which the validity of an ordinance is challenged. Such cases are conventional civil cases in which the courts reach for decision not only the adequacy of the support for action taken under an ordinance, but also the validity of the ordinance itself. See Matter of Frantellizzi v. Herman, 2d Dept. 1956, 1 A.D.2d 980, 151 N.Y.S.2d 396; *Cf.* Matter of Diocese of Rochester v. Planning Board, 1956, 1 N.Y.2d 508, 521–522, 154 N.Y.S.2d 849, 136 N.E.2d 827; Matter of Westchester Reform Temple v. Brown, 1968, 22 N.Y.2d 488, 494–497, 293 N.Y.S.2d 297, 239 N.E.2d 891; Matter of Unitarian Universal Church v. Shorten, Nassau Co., 1970, 63 Misc.2d 978, 981, 314 N.Y.S.2d 66, 70. Section 7805 authorizes a stay of administrative action pending judicial review, in proper cases. New York procedural law similarly authorizes the use of the declaratory judgment to reach directly the question of the validity of a zoning ordinance where its meaning and application are clear but the ordinance is claimed to be invalid in attempting to prohibit a use sanctioned by over-riding public policy and statute. The present action is, thus, strictly the federal alternative, in a federal question context, to such state forms of civil action as are usually invoked to test the validity of an ordinance on the basis of its terms or application, and is not in the nature of an action to enjoin criminal prosecutions.

It is contended that there are present unresolved questions of state law the resolution of which should precede an appeal to the Federal courts, since the resolution of the state law question may render it unnecessary to consider the Federal constitutional question tendered by plaintiffs. The specific argument made is that under New York Village Law McKinney's Consol.Laws, c. 892 Sections 175, 177, the authority of villages to adopt zoning laws is both granted and restricted and that the zoning is not valid zoning unless (Section 175) it is for the purpose of promoting the health, safety, morals, or the general welfare of the community through regulating and restricting the size of buildings, percentage of lot occupied, size of yards, courts and other open spaces, density of population and the location and use of buildings, structures and land, for trade, industry, residential or other purposes. Section 176 of the Village Law authorizes the Village Board of Trustees to divide the Village into zoning districts, and Section 177 requires that regulations respecting use of property within the particular zoning districts shall be made in accordance with the comprehensive plan and shall be "designed to lessen congestion in the streets; to secure safety from fire, panic, floods and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements."

Counsel point out that City of Des Plaines v. Trottner, 1966, 34 Ill.2d 432, 216 N.E.2d 116 invalidated a zoning ordinance which created a single family residence district and defined the family so as to require among the members of the occupying family relationship by blood, adoption or marriage, on the ground that the restriction of family to the familiar blood-and-marriage-related family did not serve a specifically zoning objective related to land use, although the City was restricted to such

objectives by the enabling legislation. But in so doing the court pointed out that

" . . . the considerations that the defendants advance to show that the ordinance classification is unreasonable and so violates the due process and equal protection provisions of the constitution of the United States and the due process clause of the constitution of Illinois, are relevant in determining whether the legislature has authorized such a classification."

Concluding, after discussing the cases which had considered the validity of blood-relationship limitations in single family dwelling ordinances, the Illinois court stated that the enabling legislation had not specifically authorized adoption of zoning ordinances that penetrated so deeply as the one in question into the internal composition of a single housekeeping unit. The court said finally that

" . . . until it has done so, we are of the opinion that we should not read the general authorities that it has delegated to extend so far. Such a reading would generate constitutional questions of the kind suggested by the defendants concerning which we express no opinion."

(The court noted that the trial court had reached and resolved the constitutional issue raised by the defendant, and the court stated that the constitutional question presented was a novel one and the validity of the classification a matter of broad concern throughout the state so that the court did have jurisdiction on direct appeal.)

The New York cases have considered the blood relationship limitations in two aspects; *first*, whether a blood relationship limitation can be read into the expression "family" without being expressed, and *second*, whether the expression, when defined to require a blood relationship, will be given effect.

In the Matter of Laporte v. City of New Rochelle, 2d Dept. 1956, 2 A.D.2d 710, 152 N.Y.S.2d 916, affirmed, 1957, 2 N.Y.2d 921, 161 N.Y.S.2d 886, 141 N.E. 2d 917, it was held that a religious order could erect in a one-family zoning district a building to house sixty male members of a religious community where it was not shown that they did not constitute a single, non-profit housekeeping unit, and the ordinance defined "family" as meaning "one or more persons occupying a dwelling unit as a single, non-profit housekeeping unit". In City of Schenectady v. Alumni Association of Union Chapter, 3d Dept. 1957, 5 A.D.2d 14, 168 N.Y.S.2d 754, the court held that where a city's zoning ordinance provided both a single-family residence district and a multiple dwelling district, a twenty-three member college fraternity chapter could not take over and occupy what had been a one-family dwelling since a college fraternity of twenty-three resident members was not a single family. The court considered that the ordinary and commonly accepted meaning of "single-family residence" and "one-family dwelling", in the light of the obvious objectives of the zoning ordinance, made the fraternity's approach unrealistic and without merit. The court was helped in its interpretation by the fact that the multiple-dwelling district did permit occupancy of buildings by private clubs, fraternities and lodges. The fraternity had challenged the validity of the ordinance as unconstitutionally discriminatory, and as too inequitable to justify injunctive relief, and the court summarily rejected the argument on the ground that the zoning ordinance had been generally sustained as constitutional in earlier litigation.

More recently in Town of Henrietta v. Fairchild, Monroe Co., 1967, 53 Misc.2d 862, 279 N.Y.S.2d 992, the court held that an owner's occupation of a one-family type of building was not permissible, but constituted an occupancy more like that of a boarding house, where it appeared that the landowner was a bachelor and had always had living with him from 3 to 7 young men who were also bachelors (with one exception) of similar occupations to the landowner's and

who contributed an aliquot share to the maintenance of the property, its furnishing, food costs, entertainment costs, liquor purchases, etc. The court noted that the landowner himself kept four automobiles on the property, three of which were in running order, and that the co-occupiers used another three cars in connection with the property. The words of the ordinance "single-family dwelling" were not defined but the term "boarding house" was defined as including any dwelling in which more than three persons individually or as families were housed or lodged for hire with or without meals.

On the basis of these cases it would appear that New York does countenance the use of a single family definition which requires the existence of blood relationship and marriage although its courts have not directly considered the issue of validity either as a matter of interpreting zoning enabling acts or as a constitutional matter. Abbott House v. Village of Tarrytown, 2d Dept. 1970, 34 A.D.2d 821, 312 N.Y.S.2d 841, at first reading seems to suggest that a blood relationship requirement would be considered invalid in New York as against a claim to occupy advanced for two groups of siblings living under the care of a married couple substantially in a family style, but the zoning ordinance there in question did permit of non-related groups in one-family zoning districts provided the group was not larger than five in number. Moreover, the occupancy was by a group formed under the provisions of Sections 371 and 374–b of the New York Social Services Law. The court decided the case on the ground that the local zoning ordinance was in conflict with an over-riding state law and policy favoring the care of neglected and abandoned children and exceeded the authority vested in the village. *Abbott House* does not intimate that in any other context such a limitation as the blood-relationship and marriage limitation on one-family occupancy

would have been similarly regarded as either invalid or unauthorized.

The New York law cannot be said to be unresolved in a sense relevant to the present case. The New York courts have not, indeed, considered the constitutional issues raised by the present plaintiffs in the context of the legality of the blood-relationship and marriage limitations either as a direct constitutional question or as subject matter presenting such serious constitutional problems that it ought to be a factor for weighing in the interpretation of enabling legislation. The New York courts have held that one family dwelling zoning districts can be created, and that the expression in itself does not necessarily exclude what counsel have aptly called "voluntary families" of persons unrelated by blood or marriage, that such interpretation can be placed on the single family dwelling district zoning ordinance if the context indicates that kind of an intention, and that where there is an explicit limitation to marriage-and-blood-related families it will be given effect as against "voluntary families" even if the definition also includes parent-child relations created by "adoption". The New York courts have held that a clearcut single-family dwelling ordinance of the related-by-marriage-or-blood type must yield to paramount legislation of the state which plainly overrides it.

The New York courts have gone farther. They clearly recognize that an ordinance cannot stand where it directly excludes a constitutionally protected activity in a region which is the normal sphere of exercise for that activity. Three cases involving places of worship or church-related buildings have made that clear. Matter of Diocese of Rochester v. Planning Board, *supra*, arose on review of the refusal of a zoning authority to grant a variance for the erection of a church building at the center of a one-family dwelling zoning district. The zoning authority was prepared to authorize building the church at the outskirts of the district, where new build-

ing was going on apace, but the court found that so to restrict the location of the church would be to infringe the first amendment liberty of worship. The court was clear that it was the purpose of the occupancy alone that resulted in the court's overruling the determination of the zoning authorities. Similarly in Matter of Westchester Reform Temple v. Brown, *supra,* the court was satisfied that the refusal to grant a variance to extend an existing church structure would have been unimpeachable administrative action had not the issue been one that involved the demonstrated need for an expansion of the synagogue property structures in question. Again the court held that the fact that the variance was sought in the service of an interest that was constitutionally protected, required the setting aside of zoning authority action which in other contexts would have been thoroughly correct. And finally in Matter of Unitarian Universalist Church v. Shorter, *supra,* a church-related day care center for children was held to be within New York policy and constitutional protection, and thus could not be excluded from the zoning district from which, but for the constitutionally and policy protected kind of use, it could plainly have been excluded.

Plaintiffs here present no claim of a continuing right of occupancy other than that which flows from their constitutional right to continue in occupancy, and if relegated to the State Courts, they would present exactly the same constitutional contentions there, in the confidence that they would, under New York law as a matter of Federal constitutional necessity be heard just as they are being heard in the present context and in the present case. Plaintiffs have chosen the federal forum for the hearing and decision of their federal constitutional claims. "Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility equally with the federal courts" of enforcing rights granted by the constitution. Zwickler v. Koota, 1967, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444. In the present case a state court decision holding that the ordinance, construed as the village has construed it was beyond the authority granted to the village by the New York Village Law, could apparently be based only on the argument that to hold otherwise would impose on Sections 175 and 177 of the Village Law an unconstitutional interpretation. Any unresolved question of the state law detectable here is, therefore, the federal question differently stated. The issue is the same. *Cf.* Wisconsin v. Constantineau, 1971, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515; Palo Alto Tenants Union v. Morgan, N.D.Cal.1970, 321 F.Supp. 908, 910.

■ 2. Analysis of the interests involved is not easy. Certainly families made up of a husband and wife and their children and adopted children have a right of association, a right to be private in their homes, a right to live in a one-family dwelling area, and, all seem to be agreed, a right to live in an area which is restricted to one-family dwellings used and occupied as such. Certainly, and equally, the plaintiff students, and similar student-groups, have an unquestionable right to live together in student groupings, to have their meals together and to share the expenses of their cooperative living. Certainly their pursuit of study in the same institution, and, at least in principal part, in the same field of study, is an additional interest of association which they are at liberty to promote and enhance by adding to attendance at common classes living together and even studying together. All these interests are legally protected to some extent. Certainly they are interests of association protected from prohibitions, exclusions, and inclusions imposed in form of law that have no warrant in some distinct public interest that overrides the public interest manifested in extending the sanctions of legal recognition and protection to the interests of association. In a world in which increasing amounts of land surface are zoned for different sorts of uses the associative interests advance a

claim to an appropriate place responsive to the kind of cooperating association that they are and have a right to be. Having associated themselves in groups, a traditional family, or a group of students living together, have each whatever rights of privacy and association can fairly be ascribed to each such group given its nature. That the rights would be identical with those accorded other groups could hardly be expected since they are differentiated and not identical sorts of groups. In the cases of a student group living in a suite in a university dormitory, taking their meals in common or in a house dining room, or a student group living in a university apartment building in which the students provided their own meals and their own rules of domestic conduct, their rights of privacy would have such a contour and be subject to such limitations on privacy, as were appropriate to university life and to the inevitable terms of agreement prevailing between the group and the university. Presumably the plaintiff students—and similar student groups—by the lease-terms under which they hold, surrendered some of their rights of privacy to the landowner. But whatever rights of privacy they have are free from unwarranted public intrusions and from restrictions upon the exercise of personal rights which amount to intrusions on the privacy to which, as the group that they are, they are entitled. And traditional families, too, have their comparable complex of rights, limited by the nature of the family group and its ambience.

But none of these considerations advances the argument very much. To put it one way, the families of Belle Terre may regard the Dickmans' leasing of their house to the plaintiff students for occupancy by the student group as an intrusion, as an invasion of the villagers' interests of privacy and free association, just as students living in a dormitory or in a university apartment building might resent it as an intrusion upon and an invasion of their rights of privacy and association if the university

leased any apartments to casual non-student families of husband, wife and children. The question ultimately posed is whether it is lawful to have a one-family dwelling zoning district which excludes equally small household groups who impose no greater burdens of use on the land, the building or the surroundings than a blood-and-marriage family group on the simple and bare ground that such student groups are not families made up of husband, wife and children.

It goes too far too fast to take as a postulate for further argument that creating such a zoning district denies the right of association to anyone, invades anyone's privacy, or restricts its enjoyment. Under the Dormitory Authority Act, (Public Authorities Law, Title 4, §§ 1675, 1692, McKinney's Consol.Laws, c. 870) dormitories can be and have been built for the very purpose of permitting students, including married students and their families, to associate. The Authority has the power of eminent domain (§ 1678 subd. 3), and its bonds, property and income are exempt from State taxation (other than transfer and estate taxes) (§ 1685). The plenitude of State power has been addressed to creating the State University for students to be educated and to live together. Their right of association and appropriate privacy is an assured and endowed reality. Nothing that Belle Terre can or has done can affect student groups except in the peripheral interests of student groups in realizing individual living preferences.

Plaintiffs essentially attack the ordinance on the assumption that it denies to the student group their fundamental rights of association and privacy and as such is an unconstitutional ordinance. If the ordinance was that in purpose or truly had that effect, the case would present no problem. The ordinance, indeed, denies the group the right to be associated in locus of residence with the householders of Belle Terre, and if enough other such ordinances existed, the supposed denial could approach the shape of a reality. But the objective

facts do not have that stamp. Whatever the future may hold, there evidently is available to the students similar housing in other communities, and their affidavits do not deny that. They rather say that, if plaintiffs do not occupy the Dickman house, the alternative residences available to them, in addition to dormitory living, which they reject, are apartments, which are too expensive for them, or other houses just like the Dickman house but in other communities. The thrust of the affidavit is not that just such a lease as the Dickman lease in just such a zoning district as Belle Terre's is their last resort, but rather that there is no reason and no right in their being excluded from the Dickman house with no other effect than to force them to take up residence in an exactly similar house similarly located in another community which has not so narrowly defined its one-family dwelling zoning district. The argument constructed is that if the Belle Terre ordinance is valid, every other community can adopt a similar ordinance and students will be denied the right to live in one-family dwelling districts all over—and be remitted to dormitory living or living in other kinds of zoning districts. Or, to put it in another way, the ordinance must be analyzed in terms of its being a universal one-family dwelling ordinance, since any town or village or city could incorporate similar restrictions into its one-family dwelling zoning district. The ultimate question, then, is whether the State can, without forbidden denial of rights of association and privacy to student groups living in small units under cooperative household arrangements, authorize municipal corporations to adopt zoning ordinances which provide for one-family dwelling areas in which the use of one-family dwellings is restricted to families made up of parents and their children—including adopted children—and the normal extensions of what is the familiar family of tradition, or the nuclear family of today.

The threshold question then becomes, whether there is any legally protectable affirmative interest in the establishment of even one such zoning district of marriage-and-blood-related families living in single-family dwelling houses. Such a zoning ordinance as Belle Terre's of itself indicates the existence of an interest on the part of such families in establishing a place of association to the exclusion of all other kinds of land uses however attractive, prestigious, or disfavored those other uses are. Such a restricted zoning district might well be all but impossible to justify if it had to be strictly justified by its service of such familiar zoning objectives as safety, adequate light and air, preservation of the land from overintensive use, avoiding crowding of the population, reduction of traffic congestion and facilitation of adequate transportation, water, sewerage, school, park and other public services. (*Cf.* Village Law § 177). But such one-family zoning is at the very center of the mainstream of actual zoning goals and goal achievement, coming no doubt under the inclusive health and general welfare objectives. A one-family dwelling zoning district limited to families made up essentially of parents and their children needs no apologia. Such zoning is simply another of countless statutes of bounty and protection with which the states, and all of them, and the Federal government alike aggressively surround the traditional family of parents and their children, reaching from family court laws, through laws of inheritance to tax laws. Euclid v. Ambler Realty Co., 1926, 272 U.S. 365, 394, 47 S.Ct. 114, 71 L.Ed. 303, indicated as much in the most important of the early opinions in the zoning field. It may well be that such cases as Eisenstadt v. Baird, 1972, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349, and Mindel v. United States Civil Service Commission, N.D.Cal.1970, 312 F.Supp. 485, may imply for the future that such a zoning ordinance could not be so applied as to exclude a family group that differed only in that husband and wife, while living together with their children, had not married ceremonially. But that is not the present case,

and, as the New York Court of Appeals cases cited above demonstrate, such zoning, although generally valid—arguably —could not be so applied as to exclude a family group of parents and their children on the bare ground that relation by marriage meant relation by ceremonial marriage, if that is an implication of *Eisenstadt.*

Every zoning ordinance, since it selects uses and privileges them, excludes all other uses in the land area covered by the zoning district. In a direct sense, the ordinance impinges upon every person in his freedom to exercise any one or all of the excluded uses. The dwelling district excludes the activities of all persons who have the right to and do make glue, or refine sugar, or run livery stables, or practice medicine, dentistry or architecture. Plainly it does not deny them the right to exercise their callings, but it does deny them the right to do so within the zoning district. Zoning exclusions could, no doubt, be carried to the point of unconstitutional deprivation of right simply by selection. The deprivation may result from overselection, that is, for example, by adding forbidden requirements such as those in Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, in which the ordinance provided that whites could not acquire residences on blocks where the majority of the residents were colored, nor colored persons acquire residences on blocks in which the majority of the residents were whites.

Since Belle Terre has but a single zone, the occupancy that plaintiffs desire is wholly excluded from the village. But the village, it was indicated, is only about one square mile in extent, has but 220 houses and no more than 700 inhabitants. The village had the power to zone, and had the power to adopt a single zone, in view of its small size and apparent state of development. It is not claimed that the village was, as it were, gerrymandered into existence so that it could be a single-district village.

There is no overall zoning body with coercive authority to see to it that every lawful land use is provided for. Present provision for coordination of municipal zoning and planning by county planning agencies are somewhat tentative* although not useless (see General Municipal Law, §§ 239–*l*, 239–m, McKinney's Consol.Laws, c. 29), and county and regional planning boards are authorized and in existence and their powers embrace recommendation to cities, villages and towns of a comprehensive zoning plan (General Municipal Law §§ 239–b et seq., 239–d subd. 5). See also Chapter 24, Unconsolidated Laws, providing for creation of the New York State Urban Development Corporation (§§ 6251–6285) and the New York State Urban Development and Research Corporation (§§ 6301–6325). The Court of Appeals, too, has made it clear that the day of patchwork zoning is closing; Udell v. Haas, 1968, 21 N.Y.2d 463, 288 N.Y.S.2d 888, 235 N.E.2d 897, emphasized that zoning ordinances have to serve the needs of the community as a whole, that the "comprehensive plan is the essence of zoning," since without it, "there can be no rational allocation of land use". (21 N.Y.2d at 469, 288 N.Y. S.2d at 893, 235 N.E.2d at 901). The safeguard against mistaking the effect of a particular ordinance is to see it in its total setting, recognizing that its effect, and, therefore, its validity, may be decisively influenced by the way in which neighboring communities are zoned.

There is no obstacle to the plaintiff tenants' obtaining legally similar kinds of property in other communities than Belle Terre. There is no present threat that exclusion from Belle Terre would deny to the plaintiff students the right to live as the group that they are. It may be that, as plaintiffs suggest, other villages, and the Town of Brookhaven, might move in the direction of adopting such a definition of family as Belle Terre has adopted. Should that occur

---

* Cf. Matter of We're Associates Co. v. Bear, 2d Dept.1970, 35 A.D. 846, 317 N.Y.S.2d 59.

then plainly the facts will have changed and a different case will have been presented than is now presented. But there is no genuine reason to expect such a consequence for it may be that such student groups as plaintiffs', with their ability to pay higher rentals because of their numbers, will be very welcome. It is not, of course, certain that where student groups are accepted, they may not concentrate, so that the plaintiff students would find themselves living in a student area that had become such through conversion of what was before that an area occupied almost exclusively by families made up of parents and their children. But it is somewhat difficult in theory for the plaintiff to object to that as a disfavored consequence without undermining their principal position.

The challenged ordinance does not define and exclude plaintiffs' class, that is, groups of students from a single university living together under a common household arrangement that involves the sharing of at least one meal together. It may be that the plaintiff students are a class, and as members of a definable class, the class of student groups wishing to live together as a household, but outside of the precincts of the university, and it may be that they constitute a class with respect to whom legislation may take a special view and make special provisions. Evidently zoning legislation has to some extent explicitly done so. Other zoning ordinances have been seen, including Brookhaven's, which explicitly take account of "fraternities", including them usually for zoning treatment in a class with other group housing arrangments which are distinguishable from conventional parent and children family groups. Student housing has been for 800 years a distinguishable subject matter for social and governmental concern and solicitude as well as for community and governmental restrictions. Just such arrangements as that which the plaintiff students have made is what in the medieval university of Paris was the *hospitium* and at Ox-

ford the *aula*. Indeed, there is reason to believe that it was out of, for example, the *aulae* of Oxford that the colleges of Oxford evolved and which attracted first charitable and later governmental endowments. See, 6 Cambridge Medieval History, Rashdall, The Medieval University, 559, 574–575, 590; Holmes, Daily Living in the Twelfth Century, 1952 (Repr.1964), 83; Schachner, The Medieval Universities, 1938 (1962 Repr.), 313, 331–339. Relations between the community and the university, centering often on issues of public order and on economic issues over the local cost of food and housing, have been trying and difficult incidents of a complex set of relationships that have persisted for seven centuries and more. See Schachner, Medieval Universities, *supra,* 189 et seq.; Daly, The Medieval University, 1961, pp. 190 et seq. Obviously student housing, specifically as such and oriented to the idea that students wish to live and learn together, is a matter that has been regarded as impressed with a public interest and has commanded public intervention through the exertion of the power of condemnation and the pledge of the public credit to build housing for students as students and because they are students. The student group as a household unit does form a class having legally protected interests and legally recognized claims on public protection and benefaction. It is idle, after these centuries, to suggest that a student population does not present both a problem and a benefit to the communities in which the student population exists. But for a one-family dwelling house zoning district to fail to include in its embrace the sub-class of student groups which are no larger than is the ordinary parents and children family can hardly be supposed to discriminate against the student group, or to deny it the right to exist, or to infringe its liberties of location. It is inevitable that its liberty of location will be a matter of concern and of sporadic restriction. But in the absence of a showing that the restriction on the student units' liberty of location has ad-

vanced to the point at which the student group is forced to the hardly appalling choice between disbanding, or living in a club and fraternity zone, or living together within university precincts, no substantial constitutional question is presented.

■ The conclusion reached is in result the same as that in Tenants Union v. Morgan, *supra,* 321 F.Supp. 908, but it is not considered that the case may be rested on population density, traffic problems, overloaded parking facilities, and the effect on rentals generally. Kirsch Holding Co. v. Borough of Manasquan, 1971, 59 N.J. 241, 281 A.2d 513 reached a different conclusion, and it is plain enough that Des Plaines v. Trottner, *supra,* reached a different result. Both opinions consider the issue thoroughly, but appear to reject the idea that there can be a legally protected affirmative zoning interest in the family made up of married parents and children *qua* just such a family, and the failure to accept that as a proper zoning consideration appears strange and unaccountable. Both opinions are satisfied to assert that certain uses which were no more abusive of the land than family uses and which were legitimate activities could not be zoned out of the area. That analysis appears defective; it seems to fail to take account of the essential nature of zoning as a choice among uses all of which are, in general, lawful activities which the persons normally conducting them have a perfect right to conduct and which cannot be discriminated against. The essence of zoning is that its selection is not regarded as invidiously discriminatory against uses not selected. *Cf.* Kort v. City of Los Angeles, C.A.Cal.1942, 52 Cal.App. 2d 804, 127 P.2d 66, 70. Zoning presupposes that convenient and fitting locations can be found for every legitimate land use, so that no pursuit of any use is denied, or disparaged.

It follows from what has been said that the motion for a preliminary injunction must be denied. It is accordingly

Ordered that the motion for a preliminary injunction is denied; the temporary restraining order is continued for five days after the entry of the present order to enable plaintiffs to apply to the Court of Appeals for an injunction pending appeal under Rule 8(a).