## VILLAGE OF BELLE TERRE ET AL. *v.* BORAAS ET AL.

No. 73–191.   Argued February 19–20, 1974—Decided April 1, 1974

1

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., *post*, p. 10, and MARSHALL, J., *post*, p. 12, filed dissenting opinions.

*Bernard E. Gegan* argued the cause for appellants. With him on the brief was *James J. von Oiste.*

*Lawrence G. Sager* argued the cause for appellees. With him on the brief were *Melvin L. Wulf* and *Burt Neuborne.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Belle Terre is a village on Long Island's north shore of about 220 homes inhabited by 700 people. Its total land area is less than one square mile. It has restricted land use to one-family dwellings excluding lodging houses, boarding houses, fraternity houses, or multiple-dwelling houses. The word "family" as used in the ordinance means, "[o]ne or more persons related by blood, adoption, or marriage, living and cooking together as a single housekeeping unit, exclusive of household servants. A number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family."

Appellees the Dickmans are owners of a house in the village and leased it in December 1971 for a term of 18 months to Michael Truman. Later Bruce Boraas became a colessee. Then Anne Parish moved into the house along with three others. These six are students at nearby State University at Stony Brook and none is

related to the other by blood, adoption, or marriage. When the village served the Dickmans with an "Order to Remedy Violations" of the ordinance,[1] the owners plus three tenants[2] thereupon brought this action under 42 U. S. C. § 1983 for an injunction and a judgment declaring the ordinance unconstitutional. The District Court held the ordinance constitutional, 367 F. Supp. 136, and the Court of Appeals reversed, one judge dissenting, 476 F. 2d 806. The case is here by appeal, 28 U. S. C. § 1254 (2); and we noted probable jurisdiction, 414 U. S. 907.

This case brings to this Court a different phase of local zoning regulations from those we have previously reviewed. *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, involved a zoning ordinance classifying land use in a given area into six categories. The Dickmans' tracts fell under three classifications: U–2, which included two-family dwellings; U–3, which included apartments, hotels, churches, schools, private clubs, hospitals, city hall and the like; and U–6, which included sewage disposal plants, incinerators, scrap storage, cemeteries, oil and gas storage and so on. Heights of buildings were prescribed for each zone; also, the size of land areas required for each kind of use was specified. The land in litigation was vacant and being held for industrial development; and evidence was introduced showing that under the restricted-use

---

[1] *Younger* v. *Harris,* 401 U. S. 37, is not involved here, as on August 2, 1972, when this federal suit was initiated, no state case had been started. The effect of the "Order to Remedy Violations" was to subject the occupants to liability commencing August 3, 1972. During the litigation the lease expired and it was extended. Anne Parish moved out. Thereafter the other five students left and the owners now hold the home out for sale or rent, including to student groups.

[2] Truman, Boraas, and Parish became appellees but not the other three.

ordinance the land would be greatly reduced in value. The claim was that the landowner was being deprived of liberty and property without due process within the meaning of the Fourteenth Amendment.

The Court sustained the zoning ordinance under the police power of the State, saying that the line "which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions." *Id.*, at 387. And the Court added: "A nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." *Id.*, at 388. The Court listed as considerations bearing on the constitutionality of zoning ordinances the danger of fire or collapse of buildings, the evils of overcrowding people, and the possibility that "offensive trades, industries, and structures" might "create nuisance" to residential sections. *Ibid.* But even those historic police power problems need not loom large or actually be existent in a given case. For the exclusion of "all industrial establishments" does not mean that "only offensive or dangerous industries will be excluded." *Ibid.* That fact does not invalidate the ordinance; the Court held:

> "The inclusion of a reasonable margin to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity. Such laws may also find their justification in the fact that, in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation." *Id.*, at 388–389.

The main thrust of the case in the mind of the Court was in the exclusion of industries and apartments, and as respects that it commented on the desire to keep residential areas free of "disturbing noises"; "increased traffic"; the hazard of "moving and parked automobiles"; the "depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities." *Id.,* at 394. The ordinance was sanctioned because the validity of the legislative classification was "fairly debatable" and therefore could not be said to be wholly arbitrary. *Id.,* at 388.

Our decision in *Berman* v. *Parker,* 348 U. S. 26, sustained a land-use project in the District of Columbia against a landowner's claim that the taking violated the Due Process Clause and the Just Compensation Clause of the Fifth Amendment. The essence of the argument against the law was, while taking property for ridding an area of slums was permissible, taking it "merely to develop a better balanced, more attractive community" was not, *id.,* at 31. We refused to limit the concept of public welfare that may be enhanced by zoning regulations.[3] We said:

"Miserable and disreputable housing conditions may do more than spread disease and crime and immo-

---

[3] Vermont has enacted comprehensive statewide land-use controls which direct local boards to develop plans ordering the uses of local land, *inter alia,* to "create conditions favorable to transportation, health, safety, civic activities and educational and cultural opportunities, [and] reduce the wastes of financial and human resources which result from either excessive congestion or excessive scattering of population . . . ." Vt. Stat. Ann., Tit. 10, § 6042 (1973). Federal legislation has been proposed designed to assist States and localities in developing such broad objective land-use guidelines. See Senate Committee on Interior and Insular Affairs, Land Use Policy and Planning Assistance Act, S. Rep. No. 93–197 (1973).

rality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.

"We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *Id.*, at 32–33.

If the ordinance segregated one area only for one race, it would immediately be suspect under the reasoning of *Buchanan* v. *Warley*, 245 U. S. 60, where the Court invalidated a city ordinance barring a black from acquiring real property in a white residential area by reason of an 1866 Act of Congress, 14 Stat. 27, now 42 U. S. C. § 1982, and an 1870 Act, § 17, 16 Stat. 144, now 42 U. S. C. § 1981, both enforcing the Fourteenth Amendment. 245 U. S., at 78–82. See *Jones* v. *Mayer Co.*, 392 U. S. 409.

In *Seattle Trust Co.* v. *Roberge*, 278 U. S. 116, Seattle had a zoning ordinance that permitted a " 'philanthropic home for children or for old people' " in a particular district " 'when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred (400) feet of the proposed building.' " *Id.*, at 118. The Court held that provision of the ordinance unconstitutional, saying that the existing owners could "withhold consent for selfish reasons or arbitrarily and

may subject the trustee [owner] to their will or caprice." *Id.*, at 122. Unlike the billboard cases (*e. g., Cusack Co. v. City of Chicago,* 242 U. S. 526), the Court concluded that the Seattle ordinance was invalid since the proposed home for the aged poor was not shown by its maintenance and construction "to work any injury, inconvenience or annoyance to the community, the district or any person." 278 U. S., at 122.

The present ordinance is challenged on several grcunds: that it interferes with a person's right to travel; that it interferes with the right to migrate to and settle within a State; that it bars people who are uncongenial to the present residents; that it expresses the social preferences of the residents for groups that will be congenial to them; that social homogeneity is not a legitimate interest of government; that the restriction of those whom the neighbors do not like trenches on the new-comers' rights of privacy; that it is of no rightful concern to villagers whether the residents are married or unmarried; that the ordinance is antithetical to the Nation's experience, ideology, and self-perception as an open, egalitarian, and integrated society.[4]

We find none of these reasons in the record before us. It is not aimed at transients. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618. It involves no procedural disparity inflicted cn some but not on others such as was presented by *Griffin* v. *Illinois,* 351 U. S. 12. It involves no "fundamental" right guaranteed by the Constitution, such as voting, *Harper* v. *Virginia Board,* 383 U. S. 663; the right of association, *NAACP* v. *Alabama,* 357 U. S. 449; the right of access to the courts, *NAACP* v. *Button,* 371 U. S. 415; or any rights of privacy, cf. *Griswold* v. *Connect-*

---

[4] Many references in the development of this thesis are made to F. Turner, The Frontier in American History (1920), with emphasis on his theory that "democracy [is] born of free land." *Id.*, at 32.

8

*icut,* 381 U. S. 479; *Eisenstadt* v. *Baird,* 405 U. S. 438, 453–454. We deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be " 'reasonable, not arbitrary' " (quoting *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415) and bears "a rational relationship to a [permissible] state objective." *Reed* v. *Reed,* 404 U. S. 71, 76.

It is said, however, that if two unmarried people can constitute a "family," there is no reason why three or four may not. But every line drawn by a legislature leaves some out that might well have been included.[5] That exercise of discretion, however, is a legislative, not a judicial, function.

It is said that the Belle Terre ordinance reeks with an animosity to unmarried couples who live together.[6] There is no evidence to support it; and the provision of the ordinance bringing within the definition of a "family" two unmarried people belies the charge.

[5] Mr. Justice Holmes made the point a half century ago.

"When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 41 (dissenting opinion).

[6] *Department of Agriculture* v. *Moreno,* 413 U. S. 528, is therefore inapt as there a household containing anyone unrelated to the rest was denied food stamps.

The ordinance places no ban on other forms of association, for a "family" may, so far as the ordinance is concerned, entertain whomever it likes.

The regimes of boarding houses, fraternity houses, and the like present urban problems. More people occupy a given space; more cars rather continuously pass by; more cars are parked; noise travels with crowds.

A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman* v. *Parker, supra*. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.

The suggestion that the case may be moot need not detain us. A zoning ordinance usually has an impact on the value of the property which it regulates. But in spite of the fact that the precise impact of the ordinance sustained in *Euclid* on a given piece of property was not known, 272 U. S., at 397, the Court, considering the matter a controversy in the realm of city planning, sustained the ordinance. Here we are a step closer to the impact of the ordinance on the value of the lessor's property. He has not only lost six tenants and acquired only two in their place; it is obvious that the scale of rental values rides on what we decide today. When *Berman* reached us it was not certain whether an entire tract would be taken or only the buildings on it and a scenic easement. 348 U. S., at 36. But that did not make the case any the less a controversy in the constitutional sense. When Mr. Justice Holmes said for the Court in *Block* v. *Hirsh*, 256 U. S. 135, 155, "property rights may be cut down, and to that extent taken, with-

out pay," he stated the issue here. As is true in most zoning cases, the precise impact on value may, at the threshold of litigation over validity, not yet be known.

*Reversed.*

MR. JUSTICE BRENNAN, dissenting.

The constitutional challenge to the village ordinance is premised *solely* on alleged infringement of associational and other constitutional rights of *tenants.* But the named tenant appellees have quit the house, thus raising a serious question whether there now exists a cognizable "case or controversy" that satisfies that indispensable requisite of Art. III of the Constitution. Existence of a case or controversy must, of course, appear at every stage of review, see, *e. g., Roe* v. *Wade,* 410 U. S. 113, 125 (1973); *Steffel* v. *Thompson,* 415 U. S. 452, 459 n. 10 (1974). In my view it does not appear at this stage of this case.

Plainly there is no case or controversy as to the named tenant appellees since, having moved out, they no longer have an interest, associational, economic or otherwise, to be vindicated by invalidation of the ordinance. Whether there is a cognizable case or controversy must therefore turn on whether the lessor appellees may attack the ordinance on the basis of the constitutional rights of their tenants.

The general "weighty" rule of practice is "that a litigant may only assert his own constitutional rights or immunities," *United States* v. *Raines,* 362 U. S. 17, 22 (1960). A pertinent exception, however, ordinarily limits a litigant to the assertion of the alleged denial of another's constitutional rights to situations in which there is: (1) evidence that as a direct consequence of the denial of constitutional rights of the others, the litigant faces substantial economic injury, *Pierce* v. *Society of*

*Sisters,* 268 U. S. 510, 535–536 (1925); *Barrows* v. *Jackson,* 346 U. S. 249, 255–256 (1953), or criminal prosecution, *Griswold* v. *Connecticut,* 381 U. S. 479, 481 (1965); *Eisenstadt.* v. *Baird,* 405 U. S. 438 (1972), and (2) a showing that the litigant's and the others' interests intertwine and unless the litigant may assert the constitutional rights of the others, those rights cannot effectively be vindicated. *Griswold* v. *Connecticut, supra; Eisenstadt* v. *Baird, supra;* see also *NAACP* v. *Alabama,* 357 U. S. 449 (1958).

In my view, lessor appellees do not, on the present record, satisfy either requirement of the exception. Their own brief negates any claim that they face economic loss. The brief states that "there is nothing in the record to support the contention that in a middle class, suburban residential community like Belle Terre, traditional families are willing to pay more or less than students with limited means like the Appellees." Brief for Appellees 54–55. And whether they face criminal prosecution for violations of the ordinance is at least unclear. The criminal summons served on them on July 19, 1972, was withdrawn because not preceded, as required by the village's procedure, by an order requiring discontinuance of violations within 48 hours. An order to discontinue violation was served thereafter on July 31, but was not followed by service of a criminal summons when the violation was not discontinued within 48 hours.*

The Court argues that, because a zoning ordinance "has an impact on the value of the property which it regulates," there is a cognizable case or controversy. But

---

*In these circumstances, I agree with the Court that no criminal action was "pending" when this suit was brought and that therefore the District Court correctly declined to apply the principles of *Younger* v. *Harris,* 401 U. S. 37 (1971).

even if lessor appellees for that reason have a personal stake, and we were to concede that landlord and tenant interests intertwine in respect of the ordinance, I cannot see, on the present record, how it can be concluded that "it would be difficult if not impossible," *Barrows* v. *Jackson, supra*, at 257, for present or prospective unrelated tenant groups of more than two to assert their own rights before the courts, since the departed tenant appellees had no difficulty in doing so. Thus, the second requirement of the exception would not presently appear to be satisfied. Accordingly it is irrelevant that the house was let, as we are now informed, to other unrelated tenants on a month-to-month basis after the tenant appellees moved out. None of the new tenants has sought to intervene in this suit. Indeed, for all that appears, they too may have moved out and the house may be vacant.

I dissent and would vacate the judgment of the Court of Appeals and remand to the District Court for further proceedings. If the District Court determines that a cognizable case or controversy no longer exists, the complaint should be dismissed. *Golden* v *Zwickler*, 394 U. S. 103 (1969).

MR. JUSTICE MARSHALL, dissenting.

This case draws into question the constitutionality of a zoning ordinance of the incorporated village of Belle Terre, New York, which prohibits groups of more than two unrelated persons, as distinguished from groups consisting of any number of persons related by blood, adoption, or marriage, from occupying a residence within the confines of the township.[1] Lessor-appellees, the two owners of a Belle Terre residence, and three unrelated student tenants challenged the ordinance on the ground that it establishes a classification between households of

---

[1] The text of the ordinance is reprinted in part, *ante*, at 2.

related and unrelated individuals, which deprives them of equal protection of the laws. In my view, the disputed classification burdens the students' fundamental rights of association and privacy guaranteed by the First and Fourteenth Amendments. Because the application of strict equal protection scrutiny is therefore required, I am at odds with my Brethren's conclusion that the ordinance may be sustained on a showing that it bears a rational relationship to the accomplishment of legitimate governmental objectives.

I am in full agreement with the majority that zoning is a complex and important function of the State. It may indeed be the most essential function performed by local government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life. I therefore continue to adhere to the principle of *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926), that deference should be given to governmental judgments concerning proper land-use allocation. That deference is a principle which has served this Court well and which is necessary for the continued development of effective zoning and land-use control mechanisms. Had the owners alone brought this suit alleging that the restrictive ordinance deprived them of their property or was an irrational legislative classification, I would agree that the ordinance would have to be sustained. Our role is not and should not be to sit as a zoning board of appeals.

I would also agree with the majority that local zoning authorities may properly act in furtherance of the objectives asserted to be served by the ordinance at issue here: restricting uncontrolled growth, solving traffic problems, keeping rental costs at a reasonable level, and making the community attractive to families. The police power which provides the justification for zoning is not narrowly

confined. See *Berman* v. *Parker,* 348 U. S. 26 (1954). And, it is appropriate that we afford zoning authorities considerable latitude in choosing the means by which to implement such purposes. But deference does not mean abdication. This Court has an obligation to ensure that zoning ordinances, even when adopted in furtherance of such legitimate aims, do not infringe upon fundamental constitutional rights.

When separate but equal was still accepted constitutional dogma, this Court struck down a racially restrictive zoning ordinance. *Buchanan* v. *Warley,* 245 U. S. 60 (1917). I am sure the Court would not be hesitant to invalidate that ordinance today. The lower federal courts have considered procedural aspects of zoning,[2] and acted to insure that land-use controls are not used as means of confining minorities and the poor to the ghettos of our central cities.[3] These are limited but necessary intrusions on the discretion of zoning authorities. By the same token, I think it clear that the First Amendment provides some limitation on zoning laws. It is inconceivable to me that we would allow the exercise of the zoning power to burden First Amendment freedoms, as by ordinances that restrict occupancy to individuals adhering to particular religious, political, or scientific beliefs. Zoning officials properly con-

---

[2] See *Citizens Assn. of Georgetown* v. *Zoning Comm'n,* 155 U. S. App. D. C. 233, 477 F. 2d 402 (1973).

[3] See *Kennedy Park Homes Assn.* v. *Lackawanna,* 436 F. 2d 108 (CA2 1970); *Dailey* v. *City of Lawton,* 425 F. 2d 1037 (CA10 1970); cf. *Gautreaux* v. *City of Chicago,* 480 F. 2d 210 (CA7 1973); *Crow* v. *Brown,* 457 F. 2d 788 (CA5 1972); *Southern Alameda Spanish Speaking Organization* v. *Union City,* 424 F. 2d 291 (CA9 1970). See generally Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent, 21 Stan. L. Rev. 767 (1969); Note, Exclusionary Zoning and Equal Protection, 84 Harv. L. Rev. 1645 (1971); Note, The Responsibility of Local Zoning Authorities to Nonresident Indigents, 23 Stan. L. Rev. 774 (1971).

cern themselves with the uses of land—with, for example, the number and kind of dwellings to be constructed in a certain neighborhood or the number of persons who can reside in those dwellings. But zoning authorities cannot validly consider who those persons are, what they believe, or how they choose to live, whether they are Negro or white, Catholic or Jew, Republican or Democrat, married or unmarried.

My disagreement with the Court today is based upon my view that the ordinance in this case unnecessarily burdens appellees' First Amendment freedom of association and their constitutionally guaranteed right to privacy. Our decisions establish that the First and Fourteenth Amendments protect the freedom to choose one's associates. *NAACP* v. *Button,* 371 U. S. 415, 430 (1963). Constitutional protection is extended, not only to modes of association that are political in the usual sense, but also to those that pertain to the social and economic benefit of the members. *Id.,* at 430–431; *Brotherhood of Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1 (1964). See *United Transportation Union* v. *State Bar of Michigan,* 401 U. S. 576 (1971); *Mine Workers* v. *Illinois State Bar Assn.,* 389 U. S. 217 (1967). The selection of one's living companions involves similar choices as to the emotional, social, or economic benefits to be derived from alternative living arrangements.

The freedom of association is often inextricably entwined with the constitutionally guaranteed right of privacy. The right to "establish a home" is an essential part of the liberty guaranteed by the Fourteenth Amendment. *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923); *Griswold* v. *Connecticut,* 381 U. S. 479, 495 (1965) (Goldberg, J., concurring). And the Constitution secures to an individual a freedom "to satisfy his intellectual and emotional needs in the privacy of his own home." *Stan-*

*ley* v. *Georgia,* 394 U. S. 557, 565 (1969); see *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 66–67 (1973). Constitutionally protected privacy is, in Mr. Justice Brandeis' words, "as against the Government, the right to be let alone . . . the right most valued by civilized man." *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (dissenting opinion). The choice of household companions—of whether a person's "intellectual and emotional needs" are best met by living with family, friends, professional associates, or others—involves deeply personal considerations as to the kind and quality of intimate relationships within the home. That decision surely falls within the ambit of the right to privacy protected by the Constitution. See *Roe* v. *Wade,* 410 U. S. 113, 153 (1973); *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972); *Stanley* v. *Georgia, supra,* at 564–565; *Griswold* v. *Connecticut, supra,* at 483, 486; *Olmstead* v. *United States, supra,* at 478 (Brandeis, J., dissenting); *Moreno* v. *Department of Agriculture,* 345 F. Supp. 310, 315 (DC 1972), aff'd, 413 U. S. 528 (1973).

The instant ordinance discriminates on the basis of just such a personal lifestyle choice as to household companions. It permits any number of persons related by blood or marriage, be it two or twenty, to live in a single household, but it limits to two the number of unrelated persons bound by profession, love, friendship, religious or political affiliation, or mere economics who can occupy a single home. Belle Terre imposes upon those who deviate from the community norm in their choice of living companions significantly greater restrictions than are applied to residential groups who are related by blood or marriage, and compose the established order within the community.[4] The village has, in

---

[4] "Perhaps in an ideal world, planning and zoning would be done on a *regional* basis, so that a given community would have apart-

effect, acted to fence out those individuals whose choice of lifestyle differs from that of its current residents.[5]

This is not a case where the Court is being asked to nullify a township's sincere efforts to maintain its residential character by preventing the operation of rooming houses, fraternity houses, or other commercial or high-density residental uses. Unquestionably, a town is free to restrict such uses. Moreover, as a general proposition, I see no constitutional infirmity in a town's limiting the density of use in residential areas by zoning regulations which do not discriminate on the basis of constitutionally suspect criteria.[6] This ordinance, however, limits the density of occupancy of only those homes occupied by unrelated persons. It thus reaches beyond control of the use of land or the density of population, and undertakes to regulate the way people choose to associate with each other within the privacy of their own homes.

It is no answer to say, as does the majority, that associational interests are not infringed because Belle Terre residents may entertain whomever they choose. Only last Term MR. JUSTICE DOUGLAS indicated in concurrence that he saw the right of association protected by the First Amendment as involving far more than the right to entertain visitors. He found that right infringed by a restriction on food stamp assistance, penalizing

_____

ments, while an adjoining community would not. But as long as we allow zoning to be done community by community, it is intolerable to allow one municipality (or many municipalities) to close its doors at the expense of surrounding communities and the central city." *Appeal of Girsh,* 437 Pa. 237, 245 n. 4, 263 A. 2d 395, 399 n. 4 (1970).

[5] See generally Note, On Privacy: Constitutional Protection for Personal Liberty, 48 N. Y. U. L. Rev. 670, 740–750 (1973).

[6] See *Palo Alto Tenants' Union* v. *Morgan,* 487 F. 2d 883 (CA9 1973).

households of "unrelated persons." As MR. JUSTICE DOUGLAS there said, freedom of association encompasses the "right to invite the stranger into one's home" not only for "entertainment" but to join the household as well. *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 538–545 (1973) (concurring opinion). I am still persuaded that the choice of those who will form one's household implicates constitutionally protected rights.

. Because I believe that this zoning ordinance creates a classification which impinges upon fundamental personal rights, it can withstand constitutional scrutiny only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest, *Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969). And, once it be determined that a burden has been placed upon a constitutional right, the onus of demonstrating that no less intrusive means will adequately protect the compelling state interest and that the challenged statute is sufficiently narrowly drawn, is upon the party seeking to justify the burden. See *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250 (1974); *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958).

A variety of justifications have been proffered in support of the village's ordinance. It is claimed that the ordinance controls population density, prevents noise, traffic and parking problems, and preserves the rent structure of the community and its attractiveness to families. As I noted earlier, these are all legitimate and substantial interests of government. But I think it clear that the means chosen to accomplish these purposes are both overinclusive and underinclusive, and that the asserted goals could be as effectively achieved by means of an ordinance that did not discriminate on the basis of constitutionally protected choices of lifestyle. The ordinance imposes no restriction whatsoever on the number

of persons who may live in a house, as long as they are related by marital or sanguinary bonds—presumably no matter how distant their relationship. Nor does the ordinance restrict the number of income earners who may contribute to rent in such a household, or the number of automobiles that may be maintained by its occupants. In that sense the ordinance is underinclusive. On the other hand, the statute restricts the number of unrelated persons who may live in a home to no more than two. It would therefore prevent three unrelated people from occupying a dwelling even if among them they had but one income and no vehicles. While an extended family of a dozen or more might live in a small bungalow, three elderly and retired persons could not occupy the large manor house next door. Thus the statute is also grossly overinclusive to accomplish its intended purposes.

There are some 220 residences in Belle Terre occupied by about 700 persons. The density is therefore just above three per household. The village is justifiably concerned with density of population and the related problems of noise, traffic, and the like. It could deal with those problems by limiting each household to a specified number of adults, two or three perhaps, without limitation on the number of dependent children.[7] The burden of such an ordinance would fall equally upon all segments of the community. It would surely be better tailored to the goals asserted by the village than the ordinance before us today, for it would more realistically

[7] By providing an exception for dependent children, the village would avoid any doubts that might otherwise be posed by the constitutional protection afforded the choice of whether to bear a child. See *Molino* v. *Mayor & Council of Glassboro*, 116 N. J. Super. 195, 281 A. 2d 401 (1971); cf. *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632 (1974).

restrict population density and growth and their attendant environmental costs. Various other statutory mechanisms also suggest themselves as solutions to Belle Terre's problems—rent control, limits on the number of vehicles per household, and so forth, but, of course, such schemes are matters of legislative judgment and not for this Court. Appellants also refer to the necessity of maintaining the family character of the village. There is not a shred of evidence in the record indicating that if Belle Terre permitted a limited number of unrelated persons to live together, the residential, familial character of the community would be fundamentally affected.

By limiting unrelated households to two persons while placing no limitation on households of related individuals, the village has embarked upon its commendable course in a constitutionally faulty vessel. Cf. *Marshall* v. *United States,* 414 U. S. 417, 430 (1974) (dissenting opinion). I would find the challenged ordinance unconstitutional. But I would not ask the village to abandon its goal of providing quiet streets, little traffic, and a pleasant and reasonably priced environment in which families might raise their children. Rather, I would commend the village to continue to pursue those purposes but by means of more carefully drawn and even-handed legislation.

I respectfully dissent.