**BARRE MOBILE HOME PARK, INC., Plaintiff,**

v.

**TOWN OF PETERSHAM, COUNTY OF WORCESTER, MASSACHUSETTS, Defendant.**

Civ. A. No. 83–1721–MA.

United States District Court, D. Massachusetts.

Sept. 11, 1984.

Darragh K. Kasakoff, Seder & Chandler, Worcester, Mass., for plaintiff.

Charles B. Swartwood, III, Mountain, Dearborn & Whiting, Worcester, Mass., for Petersham.

OPINION

MAZZONE, District Judge.

This is an action for declaratory and injunctive relief brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202 by Barre Mobile Home Park, Inc. (Park) against the Town of Petersham (Petersham). The plaintiff seeks a declaration that Article IX (Trailers or Mobile Homes) and Article XVI (Zoning By-Law) of Petersham's by-laws are void and unconstitutional because they absolutely prohibit any mobile home park in any part of the town.

Park also seeks an injunction compelling the amendment of these by-laws to provide for mobile home parks subject to lawfully imposed rules and regulations. Jurisdiction is properly invoked pursuant to 28 U.S.C. §§ 1343(3) and 1343(4) and under the doctrine of pendent jurisdiction.

The matter was tried to the Court without jury. Pursuant to Fed.R.Civ.P. 52(a), I make the following findings and rulings.

## I.

Park is the owner of land in Barre, Massachusetts on which it operates a mobile home park. This mobile home park covers 27.491 acres and contains 65 trailer sites varying in size between 9,000 and 12,000 square feet. The sites rent for $95.00 per month. They are serviced by 21 septic systems and 2 water wells. About 104 persons reside in the park.

Park owns about 7.8 acres of unimproved vacant land in Petersham abutting its present mobile home park. It has sought to construct and operate an additional 22 trailer sites on this land in Petersham, and has filed applications for permission or a variance to construct a mobile home park.

Article IX of Petersham's by-laws is captioned "Trailers or Mobile Homes" and provides in pertinent part as follows:

SECTION 7. For the purposes hereof, a "Trailer Park" shall mean any plot, parcel, or premises where three or more trailer sites are made available for hire or for rent.

No trailer park as so defined shall be established or maintained within the Town of Petersham.

Article XVI of Petersham's by-laws is captioned "Zoning By-Laws" and creates a single district for Petersham called "Residential-Agricultural." Section 5 of that article, entitled "Use Regulations" specifies 8 uses permitted by right, and 21 uses which may be allowed by special permit after public hearing and subject to conditions and safeguards of the Board of Appeals. Since 1978, when this article was adopted, 8 special permits have been granted for such uses as a country store, bookshop, inn, shingle mill, gift shop, craft shop and repair garage.

Petersham has denied Park's applications for a special permit or a variance on the basis of Article IX which prohibits "trailer parks" in the town. Petersham has never had a mobile home or trailer park, although there are about 6 mobile homes currently used for residential purposes in the town and located on proper building lots. Article IX was designed to accomplish the following:

1. To define trailers or mobile homes and establish their status as residential structures subject to regulation under Article VIII of the Town By-Laws.

2. To impose certain restrictions on the location of trailers or mobile homes in order to protect property values and maintain the beauty of the Town.

3. To provide for certain reasonable exceptions to the above.

4. To prevent the establishment of any trailer park within the Town.

Petersham is located in central Massachusetts, adjacent to the Quabbin Reservoir and has a population of about 1,100 persons. It occupies about 68 square miles and contains about 375–380 residences, the great majority of which are single family dwellings. The typical Petersham dwelling is a large, well-maintained colonial-style home located on 5–6 acres of land with large lawns and trees. There are about 40 businesses in the town, mostly in the center of town. In the center are a general store, package store, gas station, an inn, restaurant, retail oil company, and various municipal buildings. Other businesses in town are mostly based in the home, such as carpenters, craft shops and the like. There are no industries in town. Petersham is regarded as a bedroom community. A ¾ mile section of the center of town has been designated in the National Register of Historic Places and the town has accepted the Scenic Roads Act of the Commonwealth of Massachusetts. That act restricts the removal of trees, stone walls and the like in

order to preserve the rural nature of certain of the state's roads.

About 60% of the town land is taxable. The remaining 40% is land belonging to the Metropolitan District Commission (Quabbin Reservoir), schools, churches, Harvard University forestry school and state controlled reservations.

The town is serviced by individual septic disposal systems. The soil has a high clay content, the ground water level is high and the depth to bedrock or ledge is shallow. Given these conditions, a larger than normal disposal system is needed.

About one or two new houses are built every year. The minimum building lot size is 1.5 acres. There is no public housing in Petersham. Although special permits are possible for a number of uses, the town does not have a sanatorium, hospital, nursing or convalescent home or retirement home, or any apartment buildings, all permitted uses.

The town has denied any permit or variance for the construction of a mobile home park on the basis of its by-laws and subdivision regulations. The purposes of these by-laws and regulations are: (1) to preserve the rural nature, character and beauty of the town; (2) to maintain open spaces by avoiding high density building and population; (3) to maintain the value of property; (4) to avoid social problems associated with too rapid a rate of population growth; (5) to avoid problems associated with Petersham's inability to provide municipal services without a corresponding increase in tax revenues; (6) to protect the water supply which would be endangered by the high ground water level; and (7) to exclude the extension of commercial enterprises into a residential community.

Park has never submitted a plan for its land in Petersham that conforms with the Petersham subdivision rules and regulations. It has submitted a proposal to amend the by-laws to permit the construction of 22 sites on its 7.8 acres of land. This proposal would reduce the set-back, side-yard, frontage and minimum lot size requirements of the by-laws. Mobile homes are built to a federal construction code. Once located on a site, there is no substantial difference between a "mobile" home or a "manufactured" or "pre-fabricated" home.

## II.

The issue presented by this case is the constitutionality of Article IX of the town's by-laws which prohibits any mobile home park. Park contends that the absolute prohibition of a mobile home park is unconstitutional because such a prohibition has no reasonable relation to public health, safety and welfare, and is arbitrary, discriminatory and unreasonable. The plaintiff claims there is an urgent need for decent housing made available by mobile homes and that a mobile home park is a lawful commercial enterprise which can help to solve this significant social problem.

Petersham contends that because Article IX bears a rational relation to a permissible public purpose, and because it is reasonable and not arbitrary, it is valid.

This issue must be approached with certain basic principles in mind. First, Petersham has the power, by its zoning by-laws and by other regulations to determine its land-use policy and direction. The plaintiff has the burden of proving that Article IX is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). This Court's function is not to replace or second guess the local board. *Steel Hill Development, Inc. v. Town of Sanbornton*, 469 F.2d 956, 960 (1st Cir.1972). The actions of the town in its land-use policies are entitled to deference, *Village of Bell Terre v. Boraas*, 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797 (1973), and their by-laws have the benefit of a presumption of validity. *Shell Oil Co. v. Revere*, 383 Mass. 682, 421 N.E.2d 1181 (1981).

Having these principles in mind, I turn to the evidence to determine whether

Article IX advances the public welfare, and whether it bears a rational relationship to a permissible public purpose. The evidence supports my conclusion that a mobile home park would increase the population density of the town. A mobile home park would alter the rural character of the town, and would affect the town's ability to provide adequate social services, as well as other municipal services. Of particular concern is the town's proximity to the Quabbin Reservoir and the unusually high ground water level throughout the area. Sewage and waste disposal are real concerns in the town and require special attention and larger than normal systems. These are all real and not imaginary concerns. Finally, Article IX is designed to preserve the value of property in the town and avoid the placing of commercial enterprises in residential areas. These are all permissible purposes and Article IX is a rational means to accomplish these purposes.

The plaintiff's evidence came mostly from a land-use expert who attempted to refute each basis for prohibiting mobile home parks. He maintained that certain inherent and objectionable characteristics of a mobile home park, such as the small lot size and appearance, could be controlled by the town if it adopted certain standards. He testified that his studies did not show that a mobile home park affected adjacent property values negatively. He claimed that density, the rural nature of the town, and the environmental quality of the town would not be affected by this mobile home park. The thrust of his testimony was that any proposed park could be controlled by adequate safeguards which the town refuses to consider.

While this testimony would be applicable as a general rule, it was less convincing, in my view, because of the witness' lack of familiarity with this town and this area. He was not familiar with the size of Petersham, its population, its proximity to the Quabbin Reservoir, its ground water level, and the ability of the soil to absorb sewage and waste disposal. These were important factors in deciding what means should be adopted to accomplish the desired pur-

poses. His reasoning boiled down to a flat assertion that this prohibition was unreasonable because the town was always in the position to control any development. Carried to its logical conclusion, this testimony is in agreement with the testimony of the town's Planning Board Chairman that if Park were to submit a plan that complied with the subdivision rules, it would not be prohibited. To state it differently, the town would allow a mobile home park if the lot sizes were 1½ acres and one mobile home were placed on each lot. Obviously, for the seven acres involved here, this is not an economically feasible project. Only five mobile homes could be placed in such a park whereas the most recently submitted proposal was for 22 sites.

Herein lies the problem. The evidence shows that mobile homes or trailers have been so improved by better construction and regulation that they are really "homes." A mobile home park is really a subdivision, requiring all of the services and attention of a subdivision. Yet, the proposed park contravenes the town's subdivision rules in every respect. Petersham would not long retain its unique character were mobile home parks to be permitted.

The evidence justifies Petersham's prohibition of mobile home parks. It has a right to assure the orderly development of the entire community and avoid concentrations of populations such as mobile home parks unquestionably bring. The town could reasonably foresee a demand for additional municipal services which it is not prepared to provide. Its experience with its existing sewage and waste disposal systems alerted the town to the need to avoid concentrations of dwellings. Finally, no matter how improved mobile homes have become, they are out of character for the large, well-maintained colonial homes typical of Petersham.

The plaintiff has failed to produce competent evidence to show that this prohibition bears no substantial relationship to the public benefit. The cases cited by the plaintiff are distinguishable. They are

based on different zoning patterns, or on a state policy favoring mobile homes or facilitating a business enterprise. For example, *see High Meadows Park, Inc. v. City of Aurora,* 112 Ill.App.2d 220, 250 N.E.2d 517 (1969), and *Koston v. City of Newburgh,* 45 Misc.2d 382, 256 N.Y.S.2d 837 (1965). Those cases present a different picture than is presented here.

### Conclusion

Because the purposes of the by-laws as stated are permissible public purposes, and Article IX, which prohibits mobile home parks, is rationally related to accomplish the purposes of the by-laws, Article IX is not invalid or unconstitutional.

Judgment will be entered for the defendant Town of Petersham.

SO ORDERED.