## Group Home Inc. v. Zoning Hearing Board

*Kenneth L. Baker and Lucinda A. Bush,* for appellant.

*Clarence A. Crumrine,* for the Borough of East Washington.

RODGERS, *J.,* February 13, 1985—Group Home, Inc., a nonprofit corporation, has appealed from the decision of the Zoning Hearing Board of the Borough of East Washington, denying appellant's request for a certificate of use, occupancy and compliance for use of the premises at 80 South Wade Avenue in the Borough of East Washington, as a single-family dwelling.

By agreement, no additional evidence was presented to the court and, therefore, the court must determine whether the zoning hearing board committed an error of law or an abuse of discretion, and whether its findings are supported by substantial

evidence of record. Ramondo v. Zoning Hearing Board, 61 Pa. Commw. 242, 434 A.2d 204 (1981).

Counsel for the parties agree that the controlling issue is whether the occupation and use of the premises at 80 South Wade, by appellant, would be used as a single-family dwelling as defined in the borough's zoning ordinance, a use by right in this residential district.

For reasons hereinafter stated, the appeal of Group Home, Inc., is sustained and the zoning hearing board is directed to grant the requested certificate of use, occupancy and compliance.

The zoning hearing board found that Group Home, Inc., has agreed to purchase the premises at 80 South Wade Avenue in the borough, which is located in an R-2, medium-density residential district; that family is defined in the zoning ordinance as "a single housekeeping unit using certain rooms and housekeeping facilities in common"; that there is another group facility of three unrelated juveniles, with staff, located on North Avenue in the borough in the R-2 area; that the dwelling at 80 South Wade Avenue would be occupied by 12 residents, and one or two counselors; that ordinarily the residents would rotate about every nine or 12 months, would pay a certain percentage of their income, if they had such income, but otherwise there would be no charge; that the residents would be subject to discipline or eviction if they did not conform to the applicant's rules; that they would be between the ages of 18 and 65, and have a prior history of mental illness but not of mental retardation; that the residents would not necessarily be related by blood or marriage, and would be encouraged to act cooperatively for maintenance and upkeep of the home, and preparation of meals; that the purpose of the group home was to aid the residents to resume independ-

ent responsibilities and return as functioning members of the community; that upon acceptance into the group home program each resident would be on a 30-day probationary period, during which they might not be accepted if they did not meet the standards of the applicant; and that the residence is in the traditional sense a single-family dwelling, with but one kitchen, and would not be divided into apartments.

The zoning hearing board also found "[A] group of one to two counselors and 12 unrelated people who rotate in and out of a dwelling every nine to 12 months, who are required to have a history of mental illness and who pay for their room, board and services, is not a family either in the traditional sense of that concept or as defined by the zoning ordinance."

Upon review of the transcript, it was uncontested that the applicant Group Home, Inc., is a nonprofit corporation; that it makes no per diem charge for room and board, but that the residents are required to pay a certain percentage of their income to reimburse the applicant to encourage the residents feeling of independence and responsibility, but that if the residents do not have any income, no charge is made.

Furthermore, the evidence before the board is clear that the one or two counselors would not occupy the premises overnight as residents and that the length of time that the residents would stay in the home is not predetermined.

The Borough of East Washington is a small residential community, adjoining the City of Washington, and all of the land is zoned for residential use, R-1, low density, R-2, medium density, R-3, high density, and R-P, planned residential district.

The validity of the borough's zoning ordinance was not raised in the proceedings before the zoning

hearing board, and is not before this court. VisionQuest National, Ltd. v. City of Franklin, 74 Pa. Commw. 270, 459 A.2d 1327 (1983).

Group Home, Inc., is a nonprofit community organization, helping its residents to make the transition from a mental institution to their own homes as independent and responsible citizens of their community.

"Family" is defined in the ordinance as: "A single housekeeping unit using certain rooms and housekeeping facilities in common." It is clear that the ordinance does not require relationship by blood or kinship, nor does it place any limit on the number of persons in a "family." It is also clear as the board found, and as the exhibits make plain (appellant's Exhibits no. 2 and no. 3), the residence is constructed as a single-family dwelling house, with one kitchen, two living rooms, dining room, and seven bedrooms, together with several bathrooms. The applicant will remodel the property at a cost of about $25,000 to $30,000, and the dwelling will comply in all ways with the standards of the Pennsylvania Department of Labor and Industry, the Housing Maintenance and Occupancy Ordinance of the Borough of East Washington, and the National Building Code as adopted by the Borough of East Washington, which, inter alia, control such matters as maximum-density population, minimum space, and the safe and sanitary maintenance of the dwellings, as well as minimum standards for basic equipment and facilities, light and ventilation, and thermal standards.

It is clear that the proposed use by the applicant is in full compliance with the definition of family in the ordinance as "a single housekeeping unit using certain rooms and housekeeping facilities in common."

Nevertheless, the zoning hearing board found that the group "is not a family either in the traditional sense of that concept or as defined by the zoning ordinance." In its opinion, the zoning hearing board said this:

"The definition of 'family' within the zoning ordinance leaves something to be desired; 'A single-housekeeping unit using certain rooms and housekeeping facilities in common.' Nonetheless, for us to hold that a group of 12 unrelated people together with their counselors who rotate in and out every nine to 12 months, who are required to have a history of mental illness and who pay for the services therein, is a 'family' would defy not only the most elementary use of english, but contravene all logic established by the history and purpose of the zoning ordinance. To have such uses as a matter of right within an R-2 area blatantly contradicts not only the spirit of the ordinance but its letter. In this connection, we note that the comprehensive plan of the borough (usually cited as legislative history to the zoning ordinance) sets forth:

"The principal residential land use in East Washington shall remain low-density and single-family in character with a density of not more than seven dwelling units per acre (approximately 18 persons per acre) . . .

" 'Medium density residential developments should be limited to certain areas of the borough . . .'

" 'Logic, basic understanding and the testimony adduced make it clear that the proposed use is not a housekeeping unit in the traditional sense or as that term is used in the zoning ordinance.' "

Certainly the definition of family in the ordinance includes the proposed use by the applicant. The board, however, claimed that the legislative history

would indicate that such a group home should be excluded. Two members of the East Washington Planning Commission were called as witnesses by the borough and testified as follows:

"Q. Did the planning commission consider, when adopting the ordinance, what a family might be?

"A. [by Mr. James McGuier]: I don't believe I can answer that, whether we actually discussed what a family might be or might not be."

"Mr. Eisenmann: I have a question for Dr. Sanderlin. I will ask Dr. Sanderlin the same question, was there any mention made, as you were defining 'family' for the code, of other regulations or codes that used the same definition of family?

"The Witness: My answer would be the same as Mr. McGuier's. At that time we relied upon our consultants to draw up the planning ordinance and the planning ordinance as I recall involved three categories, R-1, R-2 and R-3, family housing, 2, family housing, 3, family housing."

Indeed, the borough has permitted a group home for three juvenile dependents or delinquents to be operated by Try Again Homes as a single-family unit under the terms of the ordinance. Counsel for the borough explained, at oral argument, this may have been a mistake on the part of the borough, but in the court's opinion it shows that the borough has not interpreted its zoning ordinance to exclude group homes, if such a home meets the definition of a single-housekeeping unit using certain rooms and housekeeping facilities in common.

However, the borough also contends that the use by the applicant is not a "family" use in the traditional sense. In the case of Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 97 S.Ct. 1932 (1977), in striking down an ordinance that unduly

restricted the concept of family Mr. Justice Brennan said this:

"I write only to underscore the cultural myopia of the arbitrary boundary drawn by the East Cleveland ordinance in the light of the tradition of the American home that has been a feature of our society since our beginning as a nation — the 'tradition' in the plurality's words, 'of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children . . . .' Ante, at 1938. The line drawn by this ordinance displays a depressing insensitivity toward the economic and emotional needs of a very large part of our society.

"In today's America, the 'nuclear family' is the pattern so often found in much of white suburbia. J. Vander Zanden, Sociology: A Systematic Approach 322 (3d ed. 1975). The Constitution cannot be interpreted, however, to tolerate the imposition by government upon the rest of us of white suburbia's preference in patterns of family living. The 'extended family' that provided generations of early Americans with social services and economic and emotional support in times of hardship, and was the beachhead for successive waves of immigrants who populated our cities, remains not merely still a pervasive living pattern, but under the goad of brutal economic necessity, a prominent pattern — virtually a means of survival — for large numbers of the poor and deprived minorities of our society. For them compelled pooling of scant resources requires compelled sharing of a household." 431 U.S. 507, 97 S.Ct. at 1940. (Concurring.)

In upholding an ordinance in the case of Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536 (1974), the Supreme Court emphasized that the definition of "family" in the ordinance would not

define family in the traditional sense. Mr. Justice Douglas said this:

"It is said, however, that if two unmarried people can constitute a 'family,' there is no reason why three or four may not. But every line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.

"It is said that the Belle Terre ordinance reeks with an animosity to unmarried couples who live together. There is no evidence to support it; and the provision of the ordinance bringing within the definition of 'family' two unmarried people belies the charge.

"The ordinance places no ban on other forms of association, for a 'family' may, so far as the ordinance is concerned, entertain whomever it likes." 416 U.S. 6, 94 S.Ct. 1540.

In the Moore case, Mr. Justice Stevens in a concurring opinion said this:

"Litigation involving single-family zoning ordinances is common. Although there appear to be almost endless differences in the language used in these ordinances, they contain three principal types of restrictions. First, they define the kind of structure that may be erected on vacant land. Second, they require a single-family home be occupied only by a 'single housekeeping unit.' Third, they often require that the housekeeping unit be made up of persons related by blood, adoption or marriage, with certain limited exceptions.

"Although the legitimacy of the first two types of restrictions is well settled, attempts to limit occupancy to related persons have not been successful. The state courts have recognized a valid community interest in preserving the stable character of resi-

dential neighborhoods which justifies a prohibition against transient occupancy. Nevertheless, in well-reasoned opinions, the courts of Illinois, New York, New Jersey, California, Connecticut, Wisconsin, and other jurisdictions, have permitted unrelated persons to occupy single-family residences notwithstanding an ordinance prohibiting, either expressly or implicitly, such occupancy." 97 S.Ct. at 1943.

Mr. Justice Stewart in his dissenting opinion said this, 97 S.Ct. at 1956, Ftn.10:

". . . The state cases that Mr. Justice Stevens discusses do not answer this federal constitutional issue. For the most part, they deal with state-law issues concerning the proper statutory construction of the term 'family,' and they indicate only that state courts have been reluctant to extend ambiguous single-family zoning ordinances to nontransient, single-housekeeping units. By no means do they establish that narrow definitions of the term 'family' are unconstitutional. . . ."

In the states of Connecticut, Florida, New York, New Jersey and Washington, where the ordinance had defined "family" in terms of single-housekeeping units, no violation of the ordinance occurred: (1) where four sisters, each of whom was married, with eight children among them, used a single-family dwelling; (2) a small group of religious novices lived on the premises under the direction of a Mother Superior; (3) a building was used as a residence for 60 student members of a Roman Catholic religious order; (4) a group of priests and lay brothers lived together in a single-family dwelling; (5) 20 nurses used a residence as a single-family; (6) and a group home, consisting of two supervisory personnel called foster parents, and a maximum of seven children, qualified as a single-family unit.

"Annotation, 'What constitute a 'family' within meaning of zoning regulation or restrictive covenant.'" 71 A.L.R. 3d 711, 713, 714, 717, 718 (1976).

In the case of Children's Home of Easton v. City of Easton, 53 Pa. Comm'w. 216, 417 A.2d 830 (1980), where "family" was defined alternatively as "Two or more persons related by blood or marriage, occupying a dwelling unit, living together and maintaining a common household, including no more than one roomer or lodger; or not more than three unrelated persons occupying a dwelling unit, living together and maintaining a common household," the Commonwealth Court held that the ordinance was invalid where the applicant proposed to operate a foster home, consisting of three foster children, the foster parents and their two natural children in an area of the City of Easton zoned residential-medium density.

Similarly, in the case of Hopkins v. Zoning Hearing Board of Abington Township, 55 Pa. Commw. 358, 423 A.2d 1082 (1980), applicants, husband and wife, had entered into a lease agreement with a nonprofit corporation, providing services to Montgomery County, whereby the home would be used as a home for three mentally retarded children, with the wife serving as a full-time house parent.

"Family" was defined in the Abington Township ordinance as "one or more persons related by blood, adoption or marriage, or not more than two unrelated persons, living and cooking together as a single housekeeping unit." The Commonwealth Court again found no rational relationship between the restrictive definition of family in the township ordinance and the state interest to preserve the residential character of the neighborhood, and held the definition unconstitutional as applied to applicants.

The borough, however, relies on the authority of the case of In Re: Miller, 85 Pa. Commw. 407, 482 A.2d 688 (1984), where the operative definition of "family" in the Middletown Township ordinance was "any number of persons living and cooking together as a single housekeeping unit." Appellant Miller owned and operated a single-family, ranch-style dwelling as a personal-care boarding home, housing unrelated adult boarders, either physically or mentally handicapped, referred by local agencies. She lived at the home together with her 18-year-old foster daughter, a helper and seven boarders. The boarders were charged on a per diem basis, and were free to leave at any time. The court held, 482 A.2d at 691:

"Thus we must determine whether appellant's home falls within the pre-June 7, 1978 definition of family. The board resolved this issue by focusing on both the commercial nature of the home as well as the fact that residence at the home, with two exceptions, has been temporary. Although admittedly a close question, we are also of the opinion that seven unrelated, rent-paying adult individuals residing temporarily in a boarding home do not constitute a single housekeeping unit.

"Appellant argues that characteristics of a single housekeeping unit are present in her home, i.e., a central kitchen, a dining room, a living room and some group participation and interaction. However, as noted by the trial court, the overriding facts are that the home is operated for a commercial purpose as the residents pay a daily fee for lodging and meals, and residence at the home has been temporary. Such factors, we feel, are not characteristic of a single housekeeping unit. Cf. McGinnis Appeal, 68 Pa. Commw. 57, 448 A.2d 108 (1982), cert. de-

nied, 461 U.S. 944, 103 S. Ct. 2121, 77 L.Ed. 2d 1301 (1983) (municipality may constitutionally limit the number of unrelated elderly persons in a group home in a residentially zoned property although allowing an unlimited number of related persons to reside there). We similarly reject appellant's argument likening her home to a traditional foster home. Foster homes are generally not operated for a commercial purpose. Moreover, foster homes attempt to duplicate the biological family, while a home such as appellant's merely attempts to duplicate family lifestyle. As recently stated by this court, 'each resident is free to leave at any time unencumbered by the social, moral and phychological bonds which, especially during child rearing years, characterize nuclear families.' Owens v. Zoning Hearing Board of Norristown, 79 Pa. Commw. 229, 231, 468 A.2d 1195, 1197 (1983) (municipality may constitutionally prohibit unrelated adults from residing together in a commercial boarding house located in a single and two-family residential district)."

In the case at bar, the applicant Group Home, Inc., is a nonprofit corporation, and the group home will not be operated for commercial purposes. On the other hand, since the residents will usually stay for nine months to a year, it is arguable that the residents do not qualify as permanent residents, even though the zoning ordinance does not require any minimum period of residence and even though the residents may stay indefinitely.

However, "permanent" residence has not been required for foster homes, a group home for nurses, a group home for adolescent girls and group homes for religious orders, among others.

This court holds that in the absence of a commercial purpose, the fact that the ordinance does not

specify a minimum term of residence does not destroy the use of the premises as a family as defined by the ordinance.

In the case of Step-By-Step Incorporated and William Shields, Appellants v. Zoning Hearing Board of the Borough of Carnegie, Appellee, Case no. SA 333 of 1982, Court of Common Pleas of Allegheny County, summarized at 132 P.L.J. 550 (1984), Judge, now Justice, Papadakos considered an application by Step-By-Step Incorporated to lease certain premises for a residence to be occupied by up to eight adults, who were mentally retarded, and who would occupy the premises as a single housekeeping unit with the assistance of a supportive staff. The subject property was in a single family residence and located in an R-D residential district. An R-D residential district included single-family detached dwellings, two family dwellings, row houses, multi-family structures, (three stories or less) multi-family structures, (four stories or more), public parks, playgrounds, schools, libraries and seven public churches in use as accessory to the above.

The ordinance defined family as "one or more persons occupying a premise and living as a single housekeeping unit, as distinguished from a group occupying a boarding house, lodging house, club, fraternity or hotel." Judge Papadakos found that the purpose of the definition was to clearly preserve the area in question as a residential neighborhood where family values may prosper.

Further, he found that the purpose of Step-By-Step Incorporated was to place disabled mentally retarded persons into a family setting as nearly as possible in the mainstream of society and to that end it fully complied with the definition of family in the ordinance.

It appears clear from the cases that a properly worded ordinance may limit the maximum number of unrelated persons residing as a group in a single-family dwelling and may establish reasonable restrictions concerning maximum density, parking, locations, etc. Indeed, East Washington, by a separate housing ordinance, has set standards for basic equipment and facilities, light and ventilation, space and sanitary maintenance, maximum density and minimum safety requirements.

However, the borough may not arbitrarily limit the use of single-family dwellings only to persons related by blood, adoption or marriage, or unreasonably restrict the maximum number of unrelated individuals who may reside in such a home.

The borough, in its zoning ordinance, has placed no restriction on the maximum number of unrelated individuals who may use the home as "a single housekeeping unit using certain rooms and housekeeping facilities in common." The subject use is, therefore, permitted by right in an R-2 residential district, and the board should have granted the requested certificate of use, occupancy and compliance.

## ORDER OF THE COURT

And now, this February 13, 1985, it is hereby ordered and decreed that the appeal of Group Home, Inc., from the decision of the Zoning Hearing Board of the Borough of East Washington is sustained, and the decision of the board is hereby reversed.

The zoning hearing board is directed to grant the requested certificate of use, occupancy and compliance for the premises at 80 South Wade Avenue in the Borough of East Washington, Washington County, Pa.