OPINION OF THE COURT
William D. Friedmann, J.
1. INTRODUCTION
The case before this court concerns a conflict between the City of New York (City) and the owners and tenants of a half dozen *837 rooming houses in Flushing, Queens. It is a conflict between well-intentioned but imperfect law, and the economic and social realities of modern urban living. If the laws under which we live are to take account of those economic and social realities, they must be examined to determine if they yield results in keeping not only with their intentions, but with the harsh tests of everyday living. If the laws are administered in a vacuum, as if the cold truth of real life did not exist, then we will find ourselves applying a set of laws to abstract situations where the reality of results and consequences has no role. If laws are to be just, there must be a relationship between their intentions and the realities of the situations they are trying to resolve.
II. FACTS OF THE CASE
The actions in this case began in 1979 when the New York City Department of Housing Preservation and Development (hereinafter DHPD) brought an enforcement- action against Ruth and Donald Buck (hereinafter defendants), owners of six multiple dwelling unit buildings occupied as rooming houses. DHPD alleged that the defendants were operating these buildings in violation of New York City Housing Maintenance Code § D26-33.07 ([Code], Administrative Code of City of New York § D26-33.07). Section D26-33.07 (a) says, “No rooming unit which was not classified and recorded as such in the department prior to May 15, 1954 or converted to such use prior to April 30, 1956, shall be created in a tenement, converted dwelling or private dwelling, whether such conversion is effected with or without physical alterations”. The section provides for certain exceptions, such as hospitals, college dormitories, etc.
Parties in this case have occasionally referred to the buildings in this case as single room occupancy buildings (SROs). This court notes that this is not really an SRO situation. According to Code § D26-107 (a) (17), an SRO is “a single room, or of two or more rooms which are joined together, separated from all other rooms within an apartment in a multiple dwelling, so that the occupant or occupants thereof reside separately and independently of the other occupant or occupants of the same apartment.” Clearly, SRO, under the New York City law, refers to rooms within a single apartment rented out to roomers. That is not the situation here, and the court makes it clear that in this case, the buildings involved are multiple dwellings used as rooming units, or as something else, but not SROs. These issues will be more fully discussed in the body of the opinion. The DHPD sought to have these buildings closed on the grounds that they violated section D26-33.07, and that the buildings in their *838 present use could never conform to section D26-33.07. The Bucks responded by bringing what could be considered a “friendly” holdover action against one of their tenants, Edward Moran, and sought his eviction in order to “comply” with the requirements of the statute. They then joined the DHPD as codefendants to that action in order that they could raise certain constitutional objections to the law. The two actions were later consolidated.
The early stages of this case are complex and torturous in the extreme, and because they do not bear direhtly on the issues before this court now, they will not be recounted here. For a synopsis of these legal maneuverings, see this court’s decision upholding the constitutionality of section D26-33.07 (Buck v Moran, NYLJ, June 29, 1983, p 13, col 1).
The defendants raised five arguments that sections D26-33.07 and D26-33.09 were unconstitutional. Section D26-33.09 (a) deals with the rental of rooms to boarders and provides that, “A family may rent one or more living rooms in an apartment to not more than two boarders, roomers or lodgers, if every living room in such apartment has free and unobstructed access to each required exit from such apartment” as provided for in other sections of the Code (§ D26-33.07 is quoted above). The defendants argued that the statutes were unconstitutional because: (1) the New York City Council lacked authority to enact the challenged sections; (2) the terms of the statute were so overly broad and vague that they failed to comport with the requirements of due process; (3) the provisions of the statutes deprived the defendants of liberty and property without due process in violation of the US Constitution, 14th Amendment; (4) the sections deny them and their tenants the equal protection of the law; and (5) the selective enforcement of the laws by the City amounted to a denial of due process and equal protection in this case, even if the statutes were not unconstitutional on their face.
This court, in its decision, found the statutes were constitutional and that the defendants’ claims by way of defense were groundless. The basis for reaching that decision was that the authority to make such laws was well within the police power of the City and that there was no substantial evidence yielding the conclusion there was a denial of due process or equal protection to the defendants. The court’s decision is more fully explained in Buck v Moran (supra). The court dismissed the action brought by the Bucks against Edward Moran, and set down the action brought by the DHPD for disposition.
*839 On November 8, 1983, the DHPD and the defendants entered into a consent degree, requiring the defendants to conform their buildings to the requirements of the Code, in effect compelling the defendants to evict their tenants. The defendants adhered to the conspnt degree by giving notice to their tenants to vacate their apartments.
The defendants and an organization formed to represent the tenants’ interests, Tenant Roomers United for Legal Protection (hereinafter TRULP or the tenants), filed several motions seeking to have the consent decree stayed or “clarified” in some way to allow the tenants to remain in their buildings. The issues raised by the defendants and the tenants are: (1) can the New York City Department of Aging and the Queens Legal Services for the Elderly be compelled to find housing for the tenants housed in the houses owned by the Bucks; (2) are sections D2633.07 and D26-33.09 unconstitutional; (3) is the definition of “family” in the Code unconstitutional, and if it is, whether the court can provide an alternative definition of “family”; and (4) can the court classify these buildings as something other than two-family dwellings converted to rooming houses, and can the boarders be considered, for the purposes of the case, as families occupying separate dwelling units.
The resolution of these issues raised since the consent decree is the subject of this opinion.
III. MOTION TO COMPEL THE DEPARTMENT OF AGING
The tenants ask that the court compel the Department of Aging (hereinafter DA) and a private organization called Queens Legal Services for the Elderly (hereinafter QLSE) to find housing for tenants evicted by the Bucks’ holdover proceedings brought in compliance with the consent decrees. This court declines to do so for two reasons:
First, the DA is designed to be an information and referral agency, not to find apartments for elderly tenants. This court can compel the DA to do no more than it has done, which is to provide housing information. To require the DA to do more, there would have to be a more specific statutory enumeration of the DA’s powers in New York City Charter § 2402. There is no specific enumeration of such a power.
Second, the vast majority of the members of TRULP are not elderly. If the court were to order the DA to take such action, they would only be able to help a small proportion of the tenants, probably 14 out of the 95 members.
*840 For the above reasons, this court dismisses the first motion.
IV. CONSTITUTIONALITY OF SECTIONS D26-33.07 AND D26-33.09
TRULP raises several arguments that question the constitutionality of the relevant sections themselves and the application of those sections to these particular defendants and tenants. These contentions include claims that the sections are overly broad and vague and fail to comport with the requirements of due process in violation of the 14th Amendment, that the defendants and their tenants have been denied equal protection of the laws, that the defendants have been deprived of their liberty and property without due process, and that even if the law is constitutional on its face, through selective enforcement it violates both equal protection and due process.
This court believes that many, if not all, of these issues have been dealt with in the prior decision, already mentioned, and are therefore law of the case binding the parties to determinations already made (Jones v State of New York, 79 AD2d 273). The only conditions under which the court would re-examine already litigated issues would be if there was “ ‘clear conviction of error’ with respect to a point of law on which [the court’s] decision was predicated” and mere doubt is not sufficient to reopen the case (Fogel v Chestnutt, 668 F2d 100, 109, cert denied sub nom. Currier v Fogel, 459 US 828, reh denied 459 US 1059).
In this case, no substantially different evidence has been presented which sheds new light on these questions of constitutionality. It is true that the specific interests of the tenants were not dealt with in the first decision. However, the tenants do not have a constitutional right to a home, and they do not, as a group, fall into any “suspect” classifications entitling them to greater protection of such a group, under the US Constitution.
There is no constitutional right to housing (Lindsey v Normet, 405 US 56, 74 [1972]). In order for this court to find equal protection or due process violations, there would need to be a showing that these laws did not bear a rational relationship between the means used and the ends desired. This court considers it law of the case that these sections have already been judged to meet that standard.
TRULP wishes this court to consider these tenants worthy of the “strict scrutiny” standard, where a fundamental right is at stake, and where a specific “suspect class” needs to be protected. In this case, the tenants are in no identifiable specific group that could be termed a “suspect class” as that term has been defined by the U. S. Supreme Court. There has been no argument presented to this court which could yield a finding that any *841 standard other than “mere rationality” could be applied to these tenants. Since the statutes at issue have already been judged to satisfy the “mere rationality” standard, no further discussion is necessary.
V. CONSTITUTIONALITY OF THE DEFINITION OF “FAMILY”
TRULP argues that the definition of the word “family” in the Code is unnecessarily restrictive because it is narrower than that provided by the State of New York, and that the City has deviated from the State’s definition for no rational reason.
It is this court’s reading of the law that municipalities can define what constitutes a “family” as long as they do not overtly discriminate against specific groups for racial or other constitutionally suspect reasons (Village of Belle Terre v Boraas, 416 US 1).
In the Belle Terre decision (supra), the Supreme Court clearly said that the local ordinance limiting the definition of a family to blood or marriage relations, or not more than two unrelated individuals, was constitutional. The court said that it is the local citizens who should decide what the character of their community should be, and that it was not the business of the courts to be making these decisions for them.
Clearly, under the Belle Terre decision (supra), this is a local decision and except where there is blatant discrimination against a “suspect class,” there is no judicial power to intervene. In this case, the New York City statute’s definition of “family” is within the police power of the City.
VI. TENANTS AS A “FAMILY”
We now turn to the central issue of this case, whether it is permissible for the tenants in these buildings to organize themselves in a manner that they will be able to remain whére they are and not violate the Code.
A. BACKGROUND OF THE TENANTS
In this case there is a classic confrontation between the power of the State to regulate the conduct of its citizens and the rights of the individual. Our system, at least in part, is founded on the premise that there must be a balance, a middle ground between the necessary regulation by the State of “the public welfare” and the rights of the individual to live with a minimal intrusion by the State into his affairs and concerns. Throughout this opinion, this court will strive to remember that the role of the judiciary is to mediate and reconcile these two interests. If the court leans *842 too heavily towards one side or the other, it is not fulfilling its function as an independent branch of government, but is simply a mindless enforcer of one set of interests against another.
In this case, the issue that first presented itself was whether the defendants’ buildings conformed with the Code, in particular under section D26-33.09. However, the issue now raised by the defendants and the tenants is whether in light of the existing social and economic circumstances, it would be in the best interests of the City of New York and of its citizens to enforce this law.
This court, for reasons stated below, will stay the enforcement of the consent decree entered into by the parties and will allow the tenants to remain in their residences, within the limits defined by this court under the statutory language of Code article 33.
The defendants and the tenants have raised an argument that the “precise” language of Code article 33 yields ambiguities that allow different applications of the law. They argue that there are possible interpretations of the statute that will allow the tenants to remain in the houses involved, while not directly contradicting the language of the statutes involved.
The court is loathe to stray from the common guidelines of statutory interpretation, and to bring the judiciary into disrepute via a strained or incredible construction of the written word. However, this court is also loathe to enforce an injustice without good reason, and will not enforce a result that plainly offends the intent of the authors of the statute involved.
This court shall attempt to demonstrate that while the result in this case may not be the expected result, it is one not only supportable by the law, but one mandated by the facts and situations surrounding the case.
The buildings involved in this case are all buildings in Flushing, Queens, and are occupied almost entirely by single men. Of the 95 men who are members of the tenants’ organization (TRULP), 32 are white, 9 Jewish,- 16 are of Indian descent, 13 are black, 8 are Hispanic, 10 are of some form of European heritage, 6 are of Middle Eastern descent, and 1 is Oriental. Most are under the age of 50 (68 out of 95), and 15 are over the age of 60. Fifty-eight of the TRULP members are employed at this time, 15 receive welfare and one receives unemployment insurance. Three are students, and 14 are retired and presumably receive Social Security payments and are eligible for Medicare. Four of the tenants receive Social Security Disability Insurance payments.
*843 Based on sample information provided the court by TRULP, the tenants’ incomes range from $61 per week, up to $200 per week. Those not employed receive income from welfare or Social Security payments. Many have health problems ranging from varicose veins, to disabilities that prevent them from working, to epilepsy. In looking at the information in this random survey, it is easy to see most of these men are the forgotten, those left behind to work and cope as well as they can. They are not completely destitute nor without assistance from our social services systems. But they are obviously near the edge of survival in our society, and they manage to scrape by through government payments or working at low-paying jobs. If they were better trained, or luckier, they might be more successful. But they are not.
In a city where the cost of everyday living seems out of range for even those in the middle class, those near the bottom have few defenses against a rising cost of living.
When those with few resources are confronted with sudden economic changes, such as the loss of a job, or a drastic increase in rent, they are hard pressed to absorb those hardships. Several recent reports have demonstrated that one of the largest causes of homelessness is the lack of low-cost housing.[1] In the last few years there has been more and more attention paid to the increasing numbers of homeless people on the streets of this City. Increasingly, these homeless people are not the traditional “Bowery Bum” but men and women of all ages.[2] According to a recent report by the Coalition for the Homeless, a New York based advocacy organization, among the causes of this “new” homelessness are unemployment, the scarcity of low-cost housing, rapid deinstitutionalization of mental patients, and reduced government entitlement programs. On the subject of the scarcity of low-cost housing, the report said: “Researchers in New York City have repeatedly encountered individuals for whom loss of housing was the immediate precipitating cause of their homelessness. Typically, these took one of three forms: eviction or threat of eviction, intolerable conditions in one’s prior residence, or rent increases that outstrip one’s ability to pay.”[3]
As the cost of living rose, in particular for decent housing, and incomes did not rise, the proportion of income needed to provide for food and shelter jumped drastically. There are many tenants *844 in these buildings using one half or more of their income to pay their rent, and their rent costs are as low as they are likely to find in New York City.
To cite an example, one of the tenant members is a 64-year-old man whose only source of income is a $244 SSI check which he receives every month. He spends $135 or $34 per week on rent for his room. That leaves $109 for food, clothing, etc., each month. It is doubtful this man could find another decent place to live for $34 per week except another similar and possibly illegal building. He pays more than 50% of his meager income just for housing; if he is to be required to pay even more just to place a roof over his head, he may be forced into the street or into an overcrowded City shelter.
Another example is a 34-year-old man who is attempting to live on a monthly welfare check of $268 and food stamps while trying to go to school. He pays rent of $52 per week. That leaves him $58 per month for costs other than housing; over 70% of his income goes for rent, and his rent is far from excessive.
It is true that many of these tenants are employed and may be able to find housing elsewhere. But there is no question in this court’s mind that many of these tenants will be forced either into another illegal building, or into the street.
They are innocent victims of circumstances and are trapped by the economic realities of modern urban living. In a statement voluntarily submitted to the court, one of the tenants said: “This has been a very difficult time for me. What has been worst of all else is the constant uncertainty regarding whether or not I will suddenly find myself without any place to live. I do not consider it just that those of us who, as much by random chance, as much as anything else, are left to be kicked about as if we were in fact wanton criminals.”
B. STATUTORY INTERPRETATION
The DHPD argues that the plain intention of Code § D2633.09 was to eliminate rooming houses in. converted buildings, except in those buildings which were designated as such before 1954. The defendants and the tenants argue that while that may be true, the statutory language is flexible enough to allow varying interpretations of which living arrangements are allowed and which are not, and that the facts here require an interpretation that will lead to the least injustice. This court agrees with that approach.
The defendants’ and tenants’ arguments are based on the premise that these buildings can be classified as something *845 other than two-family converted dwellings. They argue that, in fact, they can be viewed as multiple dwellings.
Under the Code, a multiple dwelling is a dwelling which is occupied as the home of three or more families living independently of each other. A private dwelling is a building designed and occupied for residential purposes by not more than two families.[4]
If these buildings are occupied as a private dwelling, as a group of rooming units occupied by individuals in a building designed for two families, then section D26-33.09 applies to these buildings. The statute outlaws rooming units in tenements, converted dwellings and private dwellings. Clearly, if we consider these buildings converted dwellings or private dwellings there is little ambiguity about what the result would be under the language; the buildings would be illegal.
However, the defendants and the tenants argue that there is a serious question about whether the buildings are actually private dwellings. The definition of both private and multiple dwellings seem to indicate that not just the design, but the present occupancy of the buildings determines which classification they fall under. While the design and intent of a building is partly determinative of what kind of building it is, it is apparent that equal weight must be given to the current occupancy as well. The definitions include language stating that a building is a private dwelling or a multiple dwelling because of its design and because of its actual use as well. The intent of the building is not the only consideration involved in deciding what kind of building it is, how the building is actually used plays a role also.
In this case, we give credence to the idea that a building may be characterized as a multiple dwelling in part because it is occupied as such. It is interesting that these buildings have been occupied in their present form for many years, and yet it is only recently that the DHPD has objected to them.
In arguing that these buildings are in fact multiple dwellings, there are two statutory arguments that can be advanced that the tenancies in this case are legal. These arguments are based on ambiguities and contradictions created by the specific language of the Code. Both arguments are based on the definitions of “family” in the Code.
Under the Code, a “family” is defined as (i) a single person, or (ii) two or more persons related by blood or marriage occupying a common household, with not more than two boarders, and (iii) not more than three unrelated persons occupying a dwelling *846 unit and maintaining a common household.[5] As noted earlier in this opinion we have found this definition of a family constitutional.
A dwelling unit is defined in the Code as any residential accommodation in a multiple dwelling or a private dwelling. Clearly, the rooms occupied by these tenants qualify as dwelling units, since they are used as residence accommodations.
Since “family” can be defined to mean a single person, and a multiple dwelling is a building occupied by ^‘families” living independently in dwelling units, it is possible to argue that these are dwelling units occupied by families. The ambiguity of the statutory language allows these buildings to be viewed in two different ways. They can be viewed as the DHPD view them, as rooming units in a converted dwelling, or they can be viewed as the defendants view them, dwelling units occupied by families. The language of the Code allows both interpretations to be drawn.
The defendants and the tenants also argue there is an alternative interpretation, also based on the definition of “family”. Under the third definition of family, any three unrelated persons can constitute a family,[6] and under section D26-33.09 a family may rent one or more living rooms to not more than two boarders. The tenants argue that a “family” of one or more tenants occupying a room could “rent” adjoining rooms to “boarders”. This would be practical under the language of the statutes involved.
As a practical matter, such an arrangement may require an adaptation of the facilities as they now exist, in order to create a “common household”. In this situation, one or more tenants would be deemed a “family” and would “rent” one or more connected living rooms to boarders. Since the residents of a floor share cooking and sanitary facilities in these buildings, it would not be inconvenient to group these tenants together as a “family” group.
Such an arrangement may require some structural changes in the buildings, to create a “common household”.
According to the language of section D26-33.09 (a) each family may rent “one or more living rooms in an apartment to not more than two boarders” as long as each living room has free and unobstructed access to an exit.[7] However, it may be pointed out *847 that section D26-33.09 requires a family in an apartment, and that there is no apartment here.
However, if an arrangement was set up in the buildings concerned here, creating a “common household,” it does not appear to violate the definition of an apartment under the Code, as long as the kitchen and the sanitary facilities meet the City standards. The definition of an apartment is “one or more living rooms, arranged to be occupied as a unit separate from all other rooms within a dwelling, with lawful sanitary facilities and a lawful kitchen or kitchenette for the exclusive use of the family residing in such unit.”[8] If the floors of these buildings were arranged in the manner outlined above, it would resemble a group of living rooms with lawful kitchen and sanitary facilities, and would only be used by the “family” and their boarders.
According to McKinney’s Consolidated Laws of NY, Book 1, Statutes § 146, “Prominent among the objectionable consequences sought to be avoided in the construction of statutes are hardship and injustice, and courts will take into consideration the fact that one construction will lead to hardships which another would avoid” (Freeman v Kiamesha Concord, 76 Misc 2d 915 [1974]; Blaine Personnel v Lee Org., 76 Misc 2d 110 [1973]; Kountz v State Univ., 89 Misc 2d 483, revd on other grounds 61 AD2d 835 [1978]; Saltser & Weinsier v McGoldrick, 295 NY 499 [1946]). Section 146 also says that an interpretation of an act that would require abridgement of the rights of others should be avoided, and “that sense should be attached to its provisions which will harmonize its objects with the preservation and enjoyment of all existing rights”. (Matter of Federal Land Bank v Pickard, 169 Misc 753 [1938].)
While it is true that courts should effectuate the patent intent of a statute (People v Friedman, 302 NY 75, appeal dismissed 341 US 907 [1950]; Wynehamer v People, 13 NY 378), this court believes there is strong authority, where there is a choice, to choose the interpretation that leads to the least injustice. In this case, we believe that the language of Code article 33 is capable of sustaining two interpretations, and that under the guidance of section 146, we must choose the one leading to the least injustice.
C. LEGISLATIVE INTENT
The greatest argument against adopting this interpretation is that it is contrary to the intent of the authors of the Code. While it may be true that the New York City Council intended to *848 curtail rooming houses in the City when it passed these provisions, this court is not convinced that the intent of the legislators in 1954 is still completely valid today.
According to the legislative notes for Code article 33, the intent appears to be to protect the health, safety, and welfare of those living in rooming houses and single room occupancies. The concerns about such communal living arrangements are legitimate, as this court has noted before. However, these remedies to these problems were premised on the belief that there would be alternative housing available.[9]
When the New York City Council made alterations in Code article 33 in 1967, outlawing single room occupancy housing, the legislative committee notes said, “The Committee recognizes the need for such action as a step forward in eliminating undesirable types of housing accommodations and trusts that the Administration will proceed diligently to develop adequate decent housing within which to house the people presently living in the single room occupancies who have few present alternatives available”[10] (emphasis added). It could hardly be stated more clearly that part of the intent behind those statutes was to protect the health and welfare of the tenants by providing them with better, safer accommodations.
But, if we look around today, as the TRULP organization and others have done, there is a scarcity of adequate, affordable housing.[11] One of the TRULP members reports that he was told by the welfare department that if he was forced to move from where he is now, he should try one of the men’s shelters. That is hardly a healthier, safer alternative to where he is now.
This court cannot believe that the men and women who wrote these statutes “intended” for indigent men, many of them ill, old, or unemployed, to be forced out of their apparently adequate housing to face the possibility of living on the street. It may have been their intent to eliminate unsafe and unhealthy housing, but it can’t have been their intent to compel the tenants to accept housing that is even worse.
This court is choosing an interpretation of the law that may not be in keeping with the original intent of the law, but it is doing so because to follow the original intent would be to enforce an injustice.
*849 D. VOLUNTARY FAMILIES
Also, in this State, the idea of so-called “voluntary families” has been accepted in several cases. It has been most frequently used to allow variances in town zoning laws to allow groups to live in houses zoned for single families only (Town of Ithaca v Lucente, 36 AD2d 560 [1971]; Abbott House v Village of Tarry-town, 34 AD2d 821 [1970]). In those cases, unrelated individuals were allowed to live in single-family homes even though the local zoning ordinances were restrictive in their definitions of what constituted a single family.
The most important case dealing with the broad definitions of single families was Village of Belle Terre v Boraas (416 US 1 [1974], supra). In that case, the Supreme Court upheld a local zoning ordinance limiting a single family to relatives by blood or marriage or not more than two unrelated persons. In that case, the Supreme Court never discussed whether the idea of voluntary families was acceptable or not. The court simply ruled that it was within the power of a municipality to define what arrangement of unrelated persons would constitute a family, as long as they did not discriminate on the basis of race or sex. Clearly, the decision allows municipalities to define what an unrelated family consists of, as long as they don’t actively discriminate.
The Belle Terre case (supra) has little effect on this case because it did not deal with the question of what constitutes a “voluntary” or unrelated family. Plainly, the concept of a “voluntary family” has been used in New York State, so there is precedential support for using it here, as support for this decision.
E. SUMMARY OF INSPECTIONS BY DHPD
See appendix attached to decision.
CONCLUSION
For the above-outlined reasons, this court hereby stays the consent decree entered into by the parties on November 19, 1983, and orders the defendants and the tenants to continue to formulate a workable proposal for conforming the buildings concerned to the guidelines set forth in this opinion. This court also orders the defendants Ruth and Donald Buck to correct all pending New York City Buildings Department violations. Both parties shall report to this court on their efforts and, in the interim, this court shall allow the buildings to be occupied by the tenants and DHPD shall be stayed from enforcing actions against the defendants Ruth and Donald Buck under Code § D26-33.07.
*850 APPENDIX
The court notes that the New York City Buildings Department has been aware of the fact that the buildings described in the opinion have been used as multiple occupancy dwelling since 1978. Through the efforts of the court, every building has been given a thorough inspection by a building inspector. A summary of said violations is appended hereto, along with copies of the original reports.
ADDRESS VIOLATIONS LAST INSPECTION DATE
(1) 132-61 Pople Ave. Excessive furniture in basement Nov. 7, 1984
(2) 133-54 Avery Ave. Broken ceiling over boiler, loose handrail on backyard stairway Oct. 22, 1984
(3) 42-57 Saull St. No peephole in apartment doors, broken steps, broken ceiling in kitchen, garage, boiler room, bathroom, roach infestation, loose roof ladder Aug. 7, 1984 (4) 42-10 Saull St. Excessive storage of furniture in cellar Oct. 30, 1984
(5) 143-70 Sanford Ave. Defective plasterboard wall first story, no peephole in apartment doors, defective ceiling over boiler, ceiling light fixtures Aug. 31, 1984
The court has examined the reported violations and finds them to be relatively minor violations and has ordered that they be corrected as soon as possible. The defendants have stated that most of the violations have been cleared up a long time ago. As this decision was being prepared, an application to add another dwelling owned by the defendants to this action has been made by DHPD.

. Baxter & Hopper, Causes and Recent History of Homelessness (1984); Baxter, Cox, Hopper, & Klein, One Year Later: The Homeless Poor in New York City (1982).

. Ibid.

. Baxter & Hopper, Causes and Recent History of Homelessness, at 2.

. Code § D26-1.07 (a) (6), (7).

. Code § D26-1.07 (a) (4).

. Code § D26-1.07 (a) (4).

. Code § D26-33.09 (a).

. Code § D26-1.07 (a) (14).

. NY City Council Legis Notes, June 22, 1967, at 1725.

. Ibid.

. The Problems of the Homeless Confront the City Government, 2 (No. 2) Citizens Budget Conmrn Q (Spring 1982).